James W. FOSEID, Plaintiff-Appellant,†

v.

STATE BANK OF CROSS PLAINS, Defendant-Respondent.

Court of Appeals

*No. 94–0670. Submitted on briefs May 9, 1995.—Decided October 19, 1995.*

(Also reported in 541 N.W.2d 203.)

†Petition to review denied.

For the plaintiff-appellant the cause was submitted on the briefs of *Steven J. Schooler* of *Lawton & Cates, S.C.,* of Madison and *Robert J. Gingras* of *Gingras Law Offices* of Madison.

For the defendant-respondent the cause was submitted on the brief of *Thomas J. Basting Sr.* and *Bryan D. Woods* of *Brennan, Steil, Basting & MacDougall, S.C.,* of Milwaukee and Madison.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J. James Foseid appeals from a judgment setting aside a jury verdict in his favor and

dismissing his complaint against the State Bank of Cross Plains.

Two issues are dispositive: whether the trial court erred when it overturned a jury verdict determining that the bank had (1) intentionally interfered with Foseid's prospective contract with a third party and (2) breached its duty of good-faith dealing in its own contractual relationship with Foseid. To resolve these issues, we must examine the scope of appellate review of a trial court's decision to overturn a jury verdict in a civil case.

Although we conclude that the trial court did not apply correct legal standards in ruling on the postverdict motions, we are satisfied that the verdict was properly overturned in both instances. In other words, the court was right, if for the wrong reasons. We therefore affirm the judgment.

Foseid owned a substantial amount of property in Adams County and spent several years developing it into a fish hatchery. He had borrowed money over the years from Bank One and M&I Bank to finance the development, putting the land up as collateral. He eventually defaulted on the loans, and Bank One and M&I Bank obtained judgments of foreclosure on the property.

Foseid also owned an apartment building in Madison on which the State Bank of Cross Plains held a second mortgage. The property was sold pursuant to foreclosure proceedings instituted by the first mortgagee, leaving $187,000 unpaid on the bank's second mortgage. In an attempt to protect its interest, the bank purchased the Adams County foreclosure judgments; consequently, by early 1990, the bank held a

total interest in Foseid's Adams County property of approximately $800,000.[1]

Upon acquiring the judgments, the bank informed Foseid that if he could find a purchaser for the property by March 4, 1990, the bank would not pursue a sheriff's sale of the property. In addition, the bank would discount Foseid's debt by $82,000 if he met the deadline.

When Foseid was unable to find a purchaser by March 4, the bank extended the deadline to April 6, 1990. When Foseid failed to meet the second deadline, the bank informed him, on April 27, that it would extend the deadline and monitor his progress in securing a purchaser on a "week-to-week" basis.

In late April 1990, the Nature Conservancy offered to purchase the property for $1.2 million, and on May 1, several investors, referred to as "the LaSalle Group," expressed an interest in setting up a corporation to purchase the property.

On or about May 1, 1990, Foseid informed the bank of both offers. On May 11, the bank's attorney wrote to Foseid's attorney, stating that the bank would be willing to "continue with the proposed discount" according to the following schedule:

1. If a binding sale agreement is not entered into by May 30, 1990, the original discount would be reduced by $15,000.

2. If a binding sale agreement is not entered into by June 15, 1990, there would be an additional $15,000 reduction.

3. If a binding sale agreement is not entered into by June 15, 1990, posting and publication for sher-

---

[1] According to testimony at trial, the Adams County property was appraised at $1.2 to $1.5 million in April 1990.

iff's sale would be forwarded to the Adams County Sheriff.

Foseid's discussions with the LaSalle Group continued and, on May 25, 1990, the LaSalle Group sent Foseid a letter of intent outlining in detail its proposal for purchase of the property.[2]

On May 31, 1990, Foseid's attorney wrote to the bank's attorney, notifying him that the sale with the LaSalle Group was scheduled to close by June 30. The bank responded that it would maintain the graduated deadlines set out in its letter of May 11, 1990.

On June 20, the LaSalle Group sent a draft sales agreement to Foseid's attorney, with terms differing somewhat from those set out in the letter of intent. Foseid's attorney responded with alternative proposals on June 27 and July 6.[3]

Foseid's sale eventually closed on August 15, 1990, on terms less advantageous to him than those outlined in LaSalle's original letter of intent. And because Foseid did not meet the bank's final deadline for the discount, he lost the discount and paid the outstanding foreclosure judgments and promissory note in full.

Foseid sued the bank, seeking both compensatory and punitive damages for (1) the bank's breach of its

---

[2] The letter proposed the formation of a corporation that would own the property and continue the fish hatchery operation. The LaSalle Group would pay approximately $1.1 million for a 20 to 25 percent interest in the corporation and retain an option to purchase the remainder of the interest from Foseid for $900,000. Foseid and the LaSalle Group would share in the profits from operation of the fish hatchery.

[3] During this time, the bank and the LaSalle Group discussed the possibility of the bank's assigning its foreclosure judgments to the LaSalle Group for the full amount of Foseid's debt. Such a transaction never materialized, however.

"discount" contract; (2) its breach of a "good-faith" duty to him; and (3) its intentional interference with his prospective contract with the LaSalle Group. After a five-day trial, the jury returned a special verdict in Foseid's favor, concluding that while the bank had not breached its contract with Foseid, it had breached a "duty of good faith" owed to him, and had intentionally interfered with the prospective Foseid/LaSalle contract. And, finding that the bank's conduct with respect to the interference and good-faith claims was "outrageous," the jury awarded substantial punitive damages on these claims, in addition to compensatory damages on both causes of action.

The bank moved for judgment notwithstanding the verdict, to change the special verdict answers, and for a new trial. The trial court upheld the jury's verdict with respect to the breach-of-contract claim, but overturned the findings (and compensatory and punitive damage awards) with respect to the good-faith and contract-interference claims. Foseid appeals from that decision.

## I. Standard of Review

As we have noted, the bank filed multiple (and alternative) postverdict motions: to change the answers, for a new trial, and for judgment notwithstanding the verdict (JNOV). The trial court ruled: (1) that the jury's finding that the bank had intentionally and improperly interfered with Foseid's prospective contractual relationship with the LaSalle Group was

not supported by the evidence;[4] and (2) that Foseid's good-faith claim must fail as a matter of law.[5]

---

[4] The trial court's order for judgment states that it was granting the bank's motion "for judgment notwithstanding the verdict" on the interference claim, the good-faith claim and punitive damages. It is apparent from the record, however, that with respect to the contractual interference and good-faith questions the court was not granting JNOV but rather was concluding that the evidence was insufficient to sustain the jury's answers. In addition, the parties' arguments on appeal concentrate on the sufficiency of the evidence to sustain the jury's verdict.

A motion for judgment notwithstanding the verdict does not challenge the sufficiency of the evidence; rather, it " ' "admits the facts found [in the verdict] but contends that *as a matter of law* those facts are insufficient, though admitted, to constitute a cause of action." ' " *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 120 Wis. 2d 591, 600, 357 N.W.2d 287, 292 (Ct. App. 1984), *rev'd on other grounds*, 127 Wis. 2d 127, 377 N.W.2d 605 (1985) (quoting *Wozniak v. Local 1111 of the United Elec., Radio & Mach. Workers*, 57 Wis. 2d 725, 733, 205 N.W.2d 369, 373-74 (1973)) (internal quoted source omitted) (emphasis added); *see* § 805.14(5)(b), STATS. (judgment notwithstanding the verdict to be used "in the event that the verdict is proper but, for reasons evident in the record which bear upon matters not included in the verdict, the movant should have judgment"). Indeed, where "the sufficiency of the evidence to support the jury's verdict" has been challenged, "judgment notwithstanding the verdict [is] improper." *Kolpin v. Pioneer Power & Light Co.*, 162 Wis. 2d 1, 29, 469 N.W.2d 595, 606 (1991).

[5] The court also ruled that there was insufficient evidence to support the jury's determination that the bank's conduct with respect to the interference and good-faith charges was "outrageous," entitling Foseid to punitive damages. Because we uphold the trial court's decision overturning the jury's findings on those two causes of action, we need not separately address the court's ruling on the punitive damages issue.

██

The parties hotly dispute the appropriate standards governing appellate review of a trial court's decision to overturn a jury's answers to special-verdict questions. Foseid maintains that we must uphold the jury's answers if there is any credible evidence to support them. That is the usual and long-established standard for testing the sufficiency of the evidence to support a jury's verdict applicable to both trial courts considering postverdict motions and to this court on appeal: if there is any credible evidence which, under any reasonable view, fairly admits of an inference that supports a jury's finding, that finding may not be overturned. *Page v. American Family Mut. Ins. Co.*, 42 Wis. 2d 671, 681-82, 168 N.W.2d 65, 69-70 (1969); *Ferraro v. Koelsch*, 119 Wis. 2d 407, 410-11, 350 N.W.2d 735, 737 (Ct. App. 1984), *aff'd*, 124 Wis. 2d 154, 368 N.W.2d 666 (1985); *see* § 805.14(1), STATS.

The bank argues, however, that, under *Helmbrecht v. St. Paul Ins. Co.*, 122 Wis. 2d 94, 110, 362 N.W.2d 118, 127 (1985), the proper test to be employed when the trial court sets aside or changes an answer in a jury verdict is deferential to the trial court, not the jury: whether the trial court's decision is clearly wrong. Because of seemingly contradictory language in *Helm-*

Additionally, as may be seen below, while we agree with the trial court's legal conclusion that Wisconsin law limits the cause of action for tortious bad faith to insurance cases, Foseid's good-faith claim was submitted to the jury not on that basis but on the bank's liability for breach of its implied *contractual* duty of good-faith dealing. As a result, the scope of our review of the trial court's decision to overturn the jury's answer to the bad-faith question is the same as that applicable to its decision on the interference claim.

*brecht* and various other cases bearing on the subject, we take this opportunity to address the question.

As we have noted, there can be no dispute that when a verdict has been rendered by the jury and the sufficiency of the evidence to support the verdict is challenged, both trial and appellate courts apply the "any-credible-evidence" standard.

The "clearly-wrong" test advocated by State Bank in this case originated in a line of cases—culminating, for our purposes, in *Olfe v. Gordon*, 93 Wis. 2d 173, 286 N.W.2d 573 (1980)—involving preverdict motions (formerly called motions for "nonsuit") made by the defendant at the close of the plaintiff's case to challenge the adequacy of the evidence to go to the jury in the first place.

In *Olfe*, the trial court granted the defendant's motion for dismissal or a directed verdict at the close of the plaintiff's case on grounds that the plaintiff had not brought forth sufficient evidence to take the case to the jury. The supreme court reversed, evaluating the trial court's decision under a clearly-wrong standard:

> When considering the correctness of the action *of the trial court*, this court must view the evidence in the light most favorable to the [party against whom the motion is made]. However, this court has held that it will not reverse *a trial court's ruling on a motion for dismissal (nonsuit)* unless such ruling is clearly wrong.

*Olfe*, 93 Wis. 2d at 185-86, 286 N.W.2d at 579 (emphasis added) (citation omitted). Then, quoting from *Trogun v. Fruchtman*, 58 Wis. 2d 569, 585, 207 N.W.2d 297, 306 (1973), the court explained the reason for the rule:

783

*[W]hen the trial judge rules*, either on motion for nonsuit, motion for a directed verdict, or motion to set aside the verdict, *that there is or is not sufficient evidence upon a given question to take the case to the jury*, the trial court has such superior advantages for judging of the weight of the testimony and its relevancy and effect that this court should not disturb the decision merely because, on a doubtful balancing of probabilities, the mind inclines slightly against the decision, but only when the mind is clearly convinced that the conclusion of the trial judge is wrong.

*Olfe*, 93 Wis. 2d at 186, 286 N.W.2d at 579 (emphasis added).

The emphasized language in *Olfe*, coupled with the stated rationale for deferring to the trial court's determination, satisfies us that the clearly-wrong standard is applicable *only* where (1) the decision under review is that of the trial judge, not the jury, and (2) the question being decided is whether sufficient evidence has been presented to allow the case to be submitted to the jury. Whether the motion is designated as one for directed verdict or dismissal is unimportant: if the challenge is to the sufficiency of the evidence to go to the jury in the first place, the *Olfe* clearly-wrong standard applies. If the challenge is to the sufficiency of the evidence to support the jury's verdict—however the motion is designated by the parties (or the court)—the standard is the same for the trial court and for this court on appeal: whether there is any credible evidence, or reasonable inferences based on that evidence, to support the verdict.

In *Helmbrecht*, the case State Bank primarily relies upon to support its argument that we should apply the clearly-wrong standard to the trial court's

decision, the court appears to have blended the two standards. As in *Olfe*, the defendant in *Helmbrecht* moved for a "directed verdict" at the close of the plaintiff's evidence. Rather than ruling on the motion at the time it was made, however, the court reserved its decision pending receipt of the verdict and the defendant renewed the motion after the jury returned a substantial verdict in the plaintiff's favor.[6] *Helmbrecht*, 122 Wis. 2d at 101, 362 N.W.2d at 123. After the verdict, however, the trial court did not decide the motion on the issue originally presented—whether there was sufficient evidence *to go to the jury*—but instead ruled that "the evidence *was not sufficient to support the [jury's] verdict." Id.* at 108-09, 362 N.W.2d at 126-27 (emphasis added).

On appeal, the supreme court began its analysis by setting forth the time-honored any-credible-evidence standard for review of the sufficiency of the evidence to support a jury verdict. However, continuing to refer to the trial court's decision as a "directed verdict," the court stated, quoting *Olfe*: "[W]e have also declared that this court, 'will not reverse a trial court's ruling on a motion for dismissal (nonsuit) unless such ruling is clearly wrong.' " *Id.* at 110, 362 N.W.2d at 127 (quoting *Olfe*, 93 Wis. 2d at 186, 286 N.W.2d at 579). The *Helmbrecht* court went on to quote in full the same language from *Trogun v. Fruchtman* that the *Olfe* court had used to explain why appellate courts should defer to the trial court's ruling on a motion challenging the sufficiency of the evidence to go to the jury. And while the *Helm-*

---

[6] Such a practice is not uncommon; indeed, § 805.14(5)(d), STATS., recognizes that a party who has earlier made "a motion for directed verdict or dismissal on which the court has not ruled pending return of the verdict may renew the motion after verdict."

*brecht* court appears to have applied, appropriately, the any-credible-evidence standard to the trial court's decision, its suggestion that the clearly-wrong test is also applicable to a trial court's decision on the sufficiency of the evidence to support a jury verdict[7] has led to uncertainty in the area, as evidenced by State Bank's argument in this case.

We do not consider the *Helmbrecht* court's discussion of the *Olfe / Trogun* clearly-wrong standard, and its concluding reference to that standard, to be precedential. First, because the court's analysis of the issue was confined to the sufficiency of the evidence to support the verdict and did not attempt to establish that the trial court's decision to overturn the verdict was clearly wrong for any reason other than that the evidence was insufficient, we consider the references to the *Olfe / Trogun* test to be no more than surplusage or *dicta*. Second, as we have noted above, *Olfe* and *Trogun* plainly limit application of the clearly-wrong standard to preverdict motions testing the sufficiency of the evidence to go to the jury. It has no place in the situation where the jury has spoken and the challenge is to the sufficiency of the evidence to support the verdict.

We recently commented on the subject in *Platz v. United States Fidelity & Guar. Co.*, 195 Wis. 2d 775,

---

[7] The *Helmbrecht* court concluded its discussion of the issue—a discussion confined to the sufficiency of the evidence to support the verdict—with the following statement:

> We hold that there was substantiated credible evidence to support the jury's finding . . . . The trial court was clearly wrong in granting the defendants' motion to dismiss after the verdict was returned.

*Helmbrecht v. St. Paul Ins. Co.*, 122 Wis. 2d 94, 118, 362 N.W.2d 118, 131 (1985).

781-82 n.1, 537 N.W.2d 397, 399 (Ct. App. 1995), where we stressed the importance of the distinction between

> a trial court's determination of whether there is "credible evidence" to *submit* to a jury (where, as *Helmbrecht* perhaps implied, we defer to the trial court's "superior advantages for judging of the weight of the testimony and its relevancy and effect"), and a trial court's decision on whether to *overrule* a jury's decision (where we, like the trial court, must defer to the jury's evaluation of credibility of witnesses and weight of evidence).

(Citations omitted.) It is a distinction too valuable to be lost, and it leads us to two conclusions: (1) when the court changes an answer in the jury's special verdict, or otherwise overturns a jury finding, we defer to the verdict by applying the traditional any-credible-evidence standard; and (2) it is only where the trial court grants (or denies) a motion for dismissal or directed verdict—whether at the close of the plaintiff's case or, if the decision is reserved and the motion is renewed after verdict, at that time[8]—based on its determination that the evidence was insufficient to go to the jury, that

---

[8] As we have noted above, a trial court facing a motion for directed verdict at either the close of the plaintiff's case or the close of all the evidence may decide to reserve its ruling on the motion and submit the case to the jury—and then, after the jury returns its verdict, decide whether the earlier motion should have been granted.

As we also have indicated, when the court makes the ruling so reserved, and is not overturning the jury's verdict but ruling on the earlier directed verdict and has concluded that the evidence was insufficient to go to the jury in the first place, the clearly-wrong standard would still be appropriate. It is only when the court is overturning a jury's finding or determination that we apply the any-credible-evidence standard.

the clearly-wrong standard of *Olfe* and its predecessors is properly applied.

In this case, as may be seen below, the trial court's decision (although mislabeled as a judgment notwith-standing the verdict) was one based on its determination that the evidence was insufficient to support the jury's verdict. We thus apply the any-credi-ble-evidence standard to the court's rulings.

## II. Intentional Contract Interference

We discussed the legal requirements for a claim of tortious interference with a prospective contract in *Cudd v. Crownhart*, 122 Wis. 2d 656, 364 N.W.2d 158 (Ct. App. 1985). An individual improperly interferes with a prospective contract by "(a) inducing or other-wise causing a third person not to enter into or continue [a] prospective relation or (b) preventing the other from acquiring or continuing [a] prospective rela-tion." *Id.* at 659-60, 364 N.W.2d at 160 (adopting the provisions of RESTATEMENT (SECOND) OF TORTS § 766B (1979)). Such interference is actionable, however, only if it is both "intentional" and improper. *Cudd*, 122 Wis. 2d at 660, 364 N.W.2d at 160-61. "[T]o have the requi-site intent, the defendant must act with a purpose to interfere with the [prospective] contract." *Id.* at 660, 364 N.W.2d at 160. If an actor lacks the "purpose to interfere" then his or her "conduct does not subject [him or her] to liability even if it has the unintended effect of deterring [a third party] from dealing with the [plaintiff]." *Id.*

Citing *Cudd*, Foseid argues that the following evi-dence should be held sufficient for the jury to reasonably conclude that the bank intentionally

caused a final sales agreement on less favorable terms than those contained in the letter of intent: (1) the bank, which had extended Foseid's "discount" contract several times after its initial expiration, imposed "strict" deadlines for his performance of the agreement after learning of the LaSalle Group's proposal;[9] (2) representatives of the bank and the LaSalle Group discussed possibly assigning the bank's interest in the property to the LaSalle Group while Foseid's negotiations with the LaSalle Group were ongoing; (3) at some point after its discussion with the bank, in which it presumably learned of the extent of Foseid's debts, LaSalle modified some of the terms of its earlier letter of intent; and (4) the bank "knew" that it would be paid in full regardless of which offer Foseid accepted, the LaSalle Group's or the Nature Conservancy's.[10] We agree with the trial court that the evidence is insufficient.

In *Cudd*, the plaintiff claimed that the defendant interfered with a prospective sale of his property. While the plaintiff was showing the property to a potential buyer, the defendant approached, made dis-

---

[9] We note in this regard that while the bank did cease its "direct" communication with Foseid, it continued to communicate with Foseid's counsel regarding his debts.

[10] Foseid also argues that the trial court erred by holding that he was required to show "malicious intent" or "ill will" in order to sustain his claim. Foseid is correct that he need not show malicious intent to sustain a claim of intentional interference. *See* RESTATEMENT (SECOND) OF TORTS § 766B cmt. f (1979). Our reading of the trial court's decision, however, indicates that the court, in its references to *Cudd* and the RESTATEMENT, identified and ultimately applied the correct legal standard. Further, because we also conclude that the trial court properly overturned the jury's verdict on the tortious interference claim, if there was error it was harmless.

paraging remarks about the property, disputed the placement of the boundary line between his land and the plaintiff's, and even threw a punch at the potential buyer. The sale fell through and the potential buyer testified that he would have made an offer on the property but for the boundary-line dispute. *Cudd*, 122 Wis. 2d at 658, 364 N.W.2d at 159-60. The jury found the defendant liable for intentional interference with the potential sale. We reversed, holding that, even viewing the evidence in the light most favorable to the verdict, it was "insufficient for the jury to reasonably conclude that [the defendant] intentionally acted with the purpose to induce or otherwise cause [the purchaser] to not enter into the prospective contract." *Id.* at 662, 364 N.W.2d at 161.

We reach a similar conclusion here. Our review of the testimony satisfies us that there is no credible evidence which under any reasonable view fairly admits of an inference that the bank's actions caused the result Foseid complains of—a final sale agreement with LaSalle that was somewhat more disadvantageous to him than the proposal outlined in the initial negotiations. Indeed, Foseid's own witnesses could do no more than speculate that the bank's actions may have caused some modifications in the LaSalle negotiations.[11] And while, as we have noted above, a jury

[11] Foseid correctly points out that interference may also be found where the actor "knows that the interference is certain or substantially certain to occur as a result of his [or her] action." *See* RESTATEMENT (SECOND) OF TORTS § 766 cmt. j (1979). The supreme court has held, however, that this section applies only where "it is apparent *at the outset* that the alleged tortfeasor acted with the intention to interfere with the [prospective contract] or acted in such a fashion and for such purpose that he

verdict will be upheld if there is any credible evidence to support it, we have also recognized that "[a] jury cannot base its findings on conjecture and speculation." *Herbst v. Wuennenberg*, 83 Wis. 2d 768, 774, 266 N.W.2d 391, 394 (1978).

As we noted in *Cudd*, "[A] party has a right to protect what he believes to be his legal interest." *Cudd*, 122 Wis. 2d at 662, 364 N.W.2d at 161. The only reasonable conclusion to be drawn from the evidence in this case is that the bank, by setting deadlines and discussing a possible assignment of its interest in the property, was acting to protect those interests: to motivate Foseid to close a sale as soon as possible and to try to secure its own position should his negotiations fail. Considering the testimony in the light most favorable to Foseid, there is no evidence from which it may reasonably be inferred that the bank had formed the intent to interfere with his sale of the property (indeed, the history of the bank's dealings with Foseid reflect its interest in having him sell the property and satisfy the bank's judgments), or that the bank acted improperly in this respect. The trial court properly overturned the jury's finding on the contract-interference claim.

## III. Breach of the Duty of Good Faith

As noted above, the trial court overturned the jury's answer to the duty of good faith questions, rea-

knew that the interference was 'certain, or substantially certain, to occur.' " *Augustine v. Anti-Defamation League of B'nai B'rith*, 75 Wis. 2d 207, 221, 249 N.W.2d 547, 554 (1977) (emphasis added). Foseid has not referred us to any evidence suggesting that State Bank, in its contacts with the LaSalle Group, acted in anticipation of disadvantaging Foseid in his negotiations with LaSalle.

soning that because Wisconsin courts have limited tort liability for breach of the duty of good faith to cases involving insurance companies and their insureds, Foseid was not entitled to recover on this claim.

We noted in *Hauer v. Union State Bank*, 192 Wis. 2d 576, 594, 532 N.W.2d 456, 463 (Ct. App. 1995), that Wisconsin's recognition of a tort of bad faith or lack of good faith in certain insurance cases, and its concomitant adherence to the rule implying a duty of good-faith dealing in all contracts, can lead to confusion—as this case also shows.

The bank argues, for example, that Foseid tried his bad-faith claim as one sounding in tort and that it was properly dismissed by the trial court, while Foseid maintains that the case was tried and submitted to the jury as a contract bad-faith claim and should be judged on that basis. The jury's verdict and the trial court's postverdict decision perpetuate the confusion for, while the court's instructions to the jury on the issue were limited to *contract* bad faith, it treated the verdict question (and the jury's answer) as if the claim was one for the *tort* of bad faith, and overturned the finding on that basis.[12]

We emphasized in *Hauer* that the "tort of 'lack of good faith' or 'bad faith'" does not exist in Wisconsin other than in certain cases involving insurance companies and their insureds.[13] *Id.* at 595, 532 N.W.2d at

---

[12] The confusion was exacerbated by the fact that a punitive-damages question—an issue limited to tortious conduct—was submitted to the jury along with the good-faith question. As indicated elsewhere in this opinion, the punitive-damages issue is moot in light of our decision herein.

[13] Because tort and contract actions are, to a large degree, apples and oranges, where a tort claim is made and a contract is involved, the case may proceed in tort only if there is a duty

792

463. Because, however, we were able to ascertain that the plaintiff's bad-faith claim in *Hauer* "was ultimately tried and presented to the jury under contract theories, not a tort of bad faith," we evaluated it as a contract claim on appeal. *Id.*

In this case, while the parties hold differing views as to precisely how the bad-faith issue was raised and tried, there is no question that it was submitted to the jury as a "contract" bad-faith claim, for their only instruction on the subject was the contract instruction: that "[e]very contract implies good faith and fair dealing between the parties" and "a promise against arbitrary or unreasonable conduct." WIS J I—CIVIL 3044.[14]

---

owed by the defendant to the plaintiff that is independent of the duty to perform under the contract, such as a fiduciary relationship. *Hauer v. Union State Bank*, 192 Wis. 2d 576, 594, 532 N.W.2d 456, 463 (Ct. App. 1995). And although the insurer/insured relationship is a creature of contract—the insurance policy—we recognize a bad-faith cause of action by insureds not because the challenged acts involve a "tortious breach of a contract" but because the independent fiduciary duty an insurer owes to its insured has been breached. *Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 423-24, 405 N.W.2d 354, 365 (Ct. App. 1987).

[14] The instruction defines "good faith" as "honesty in fact in the conduct or transaction concerned, that is, an honest intention to abstain from taking unfair advantage of another, through technicalities of law, by failure to provide information or to give notice, or by other activities which render the transaction unfair." And it holds the parties to "those reasonable standards of fair dealing which the parties, taking into account the circumstances in which they are doing business, have a right to expect."

We assume that the trial court gave the instruction because it was warranted by the evidence. *See D.L. v. Huebner*, 110 Wis.

We conclude, therefore, that the trial court improperly overturned the jury's affirmative answer to the bad-faith question on the "legal" ground that it was a tort rather than a contract inquiry. As a result of that ruling, the court never considered the bank's arguments that there was insufficient evidence in the record to support the jury's affirmative answer to the question. We think that is immaterial, however, for, as we have noted above, we review the sufficiency of the evidence to support a verdict under the same any-credible-evidence standard as the trial court.[15] It is thus appropriate for consideration on this appeal.

There is a preliminary matter, however. As we have noted above, the first series of questions in the special verdict asked whether the bank had breached its "discount" contract with Foseid, and the jury responded in the negative. The trial court upheld that portion of the verdict on postverdict motions, and its decision on the issue is not challenged on this appeal. The question arises, then, whether an alleged breach of the implied duty of good-faith dealing is subsumed under the general question inquiring into breach of the contract. Stated differently, is a breach of the implied duty of good-faith dealing something separate from breach of the terms of the contract? We think it is.

The bank disagrees, asserting that because the duty of good faith and fair dealing "is an element of

---

2d 581, 624, 329 N.W.2d 890, 910 (1983) (instructions must be framed in light of the evidence, and it is error to instruct on an issue not supported by the evidence).

[15] *See Helmbrecht v. St. Paul Ins. Co.*, 122 Wis. 2d 94, 109, 362 N.W.2d 118, 127 (1985) (any-credible-evidence standard of § 805.14(1), STATS., applies to both the trial court on postverdict motions and to supreme court on appeal).

contract performance," it must be considered as included in the first breach-of-contract question. To give the good-faith inquiry independent life, argues the bank, would result in a "duplicitous" verdict.

The bank correctly points out that we noted in *Schaller v. Marine Nat'l Bank*, 131 Wis. 2d 389, 402-03, 388 N.W.2d 645, 651 (Ct. App. 1986), that at least one law review article has characterized "good faith" as " 'decency, fairness or reasonableness *in performance or enforcement' of a contract*" (emphasis added), but we do not consider that reference as a holding that violation of the implied promise of good-faith dealing may not be considered independent of any breach (or lack of breach) of the underlying contract. Indeed, such a holding would run contrary to the supreme court's decision in *Estate of Chayka*, 47 Wis. 2d 102, 176 N.W.2d 561 (1970).

In *Chayka*, a husband and wife contracted to execute joint and reciprocal wills, which, upon one party's death, would leave all property to the other and, upon the survivor's death, would leave all property owned by the survivor to another relative. *Id.* at 103-04, 176 N.W.2d at 562. After the husband's death, the wife remarried and, shortly thereafter, conveyed virtually all of her property to her new husband (or, in some instances, to herself and her husband in joint tenancy). On the wife's death, her estate sought to overturn the conveyances. Resisting the challenge, the second husband argued that the will contract had been fully performed because a will with all of the agreed-upon terms had been executed (and fully performed, in that the wife did leave the property that remained to the relative). *Id.* at 107, 176 N.W.2d at 564. The supreme court rejected the argument, concluding that while the contract had been fully complied with "in form," the

wife's action "breaches the covenant of good faith that accompanies every contract, by accomplishing exactly what the agreement of the parties sought to prevent." *Id.* at 107, 176 N.W.2d at 564 (footnote omitted).

We think *Chayka* may be read in only one way: that a party may be liable for breach of the implied contractual covenant of good faith even though all the terms of the written agreement may have been fulfilled. We thus consider whether there is any credible evidence in the record to support the jury's affirmative answer to the good-faith question.

Foseid argues that the jury's answer is supported by the same evidence he advanced in support of the answer to the contract-interference question: (1) the bank, having notice of Foseid's discussions with the LaSalle Group, imposed the "final" deadlines for his performance; and (2) at some point the bank discussed assigning its interest to LaSalle.

As we noted in our discussion of the good-faith jury instruction, the rule implying a covenant of good-faith conduct in all contracts is intended as a guarantee against "arbitrary or unreasonable conduct" by a party. *See* WIS J I—CIVIL 3044. "Good faith" is a term frequently defined in the negative, such as "the absence of bad faith." In the RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a, it is stated that the concept of good faith "excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." Discussing "good faith performance," the text continues:

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obliga-

tion goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

*Id.* at cmt. d.

In *Chayka*, as we have indicated, a breach of the good-faith covenant was found where the surviving spouse's actions, while not breaching any specific provision of the written contract, "stripped near all of the flesh from the bones" of the agreement by divesting herself of most of the property prior to her death and thus "accomplishing exactly what the agreement . . . sought to prevent." *Chayka*, 47 Wis. 2d at 107, 176 N.W.2d at 564.

That is not the situation here. Even viewing the evidence in the light most favorable to the verdict, we do not believe a jury could reasonably conclude that the bank's conduct was "unreasonable" or a "subterfuge," or that it amounted to an evasion of the spirit of the agreement, an abuse of power or an interference with Foseid's performance.

Foseid had been in serious default on several bank loans for many years and his failure to make any payments on the obligations served only to increase them over time. Even so—and even in the face of Foseid's continuing inability to find a buyer for the property—the bank granted him several extensions of its promised "discount" in the face of his continuing inability to sell the property. After a long period of waiting in

797

vain for any sign that the obligations were going to be paid, the bank set a final deadline as an incentive to motivate Foseid to close a sale and pay off the obligations. Indeed, Foseid's own expert, John Schwegel, acknowledged that the bank was justified in setting deadlines for payment, that Foseid had never met any of the deadlines, and that it was appropriate for the bank to withdraw its offer of a discount after the deadlines had passed.

Evidence that the bank, under those circumstances, eventually set final deadlines for its discount offer, and that at some point it discussed assigning the loans to the LaSalle Group, cannot under any reasonable view support an inference that it was acting in bad faith or in derogation of its discount agreement with Foseid.

We conclude, therefore, that the trial court properly, if for the wrong reasons, overturned the jury's findings with respect to Foseid's claims for contract interference and breach of the implied contractual covenant of good-faith dealing.

*By the Court.*—Judgment affirmed.