**CUSTOM PRODUCTS CORPORATION,**
Plaintiff,

v.

**INTERMET CORPORATION,**
Defendant.

No. 99–C–0158.

United States District Court,
E.D. Wisconsin.

Sept. 28, 2001.

Daniel A. Kaplan, Sharon K. Mollman Elliott, Foley & Lardner, Madison, WI, Robert L. Binder, Elizabeth L. Wolf, Foley & Lardner, Milwaukee, WI, for plaintiff.

Scott W. Hansen, Dean E. Mabie, Christopher P. Banaszak, Reinhart Boerner Van Deuren, Norris & Rieselbach, Milwaukee, WI, Kenneth J. McIntyre, Richard A. Wilhelm, Scott T. Seabolt, Dickinson Wright, Detroit, MI, for defendant.

## DECISION AND ORDER

RANDA, District Judge.

This contract dispute comes before the Court for decision after a trial to the Court. For the following reasons, judgment is awarded in defendant's favor.

## I. FACTUAL BACKGROUND

The following facts are undisputed. Defendant Intermet Corporation ("Intermet") is located in Troy, Michigan, and Plaintiff Custom Product Corporation's ("CPC") is located in Oconomowoc, Wisconsin. Both parties are suppliers to the automotive industry. In 1997, Daimler–Crysler awarded Intermet a contract to provide cast metal differential case housings for the "AN/DN axle program," which included the Dodge Durango (AN) and the Dodge Dakota (DN) vehicle lines. Intermet retained CPC to perform the machining operation on the differential castings. On November 25, 1998, Intermet terminated CPC and retained Linimar Corporation to perform the machining operation. Intermet claims that it terminated the contract because CPC was unable to meet the program's machining capability and capacity requirements or the deadlines set for meeting these requirements. CPC claims that it did demonstrate that it would be able to meet capability and capacity requirements well before production was to begin.

CPC filed the present action in Wisconsin state court alleging breach of contract and breach of the implied covenant of good faith and fair dealing. Intermet removed

the action to this Court based on diversity of citizenship and filed a counterclaim for breach of contract. The Court conducted a ten day bench trial.

In the spring of 1997, DaimlerChrysler submitted a request for quote to Intermet for the manufacture of cast metal differential case housings to be used on Daimler-Crylser's model year 2000 AN/DN axle program. "AN/DN" refers to Daimler-Crylser's Dodge Dakota pick-up truck and Dodge Durango sport utility vehicle. The part for the differential case housing was 50269902AA ("902AA"). 902AA is a "critical axle drive component." It is also a "complex part requiring extensive and precise machining."

CPC submitted promotional literature to Intermet holding themselves out to have the ability and expertise to deliver "world-class, high-volume quality," to achieve "machine tolerances in 'millionths' of an inch, while meeting virtually any high-volume requirements," to support a " 'zero defects' philosophy," and to produce "DIFFICULT PARTS IN A REPETITIVE PRODUCTION ENVIRONMENT." CPC Brochure entitled "World Class Machining," DX 502, passim (italics and capitals in original). CPC's sales representative, Ray Hodge, also gave Intermet a promotional video entitled "On the Leading Edge" in order to secure the 902AA program. In the video, CPC represented to Intermet that CPC has the ability and expertise to maintain "inspection values of 1.67 Cpk" and to "deliver consistent quality." PFPF 19.

After receiving CPC's promotional materials, Intermet requested a quote from CPC for machining on the 902AA differential case program and asked for a preliminary print for the machining that CPC would perform. PFOF 20–21. On May 13, 1997, CPC submitted a quotation for $8.94. Intermet informed CPC that Lini-

mar had submitted a more competitive quotation. PFPF 23. On June 13, 1997 CPC submitted a second quotation for $8.05. (However the contract was later modified to a price of $8.09 to accommodate the addition of a roll-pin hole.) PFPF 24. Thereafter, Intermet identified CPC as the machining supplier and submitted a quote to DaimlerChrysler using CPC's revised quotation. PFOF 25. DaimlerChrysler identified Intermet as the Tier 1 suppler on the 902AA differential case program, and Intermet selected CPC as the Tier 2 machining supplier. PFOF 26.

There are no guarantees in the automotive industry as to how long a particular program, such as the AN/DN axle program will continue into the future. There are also no guarantees on annual volumes in the automotive industry. The length of a program and annual volumes are based upon various factors such as customer satisfaction, consumer trends, and engineering changes. PFOF 30.

Before going into production, an automotive supplier is required to demonstrate its ability to produce parts within the required specifications (process capability) and at the required volumes (production capacity). PFOF 34. The standards and practices generally applicable for demonstrating process capability and production capacity in the automotive industry are primarily set forth in a series of 7 manuals. The manuals contain general provisions that apply to automotive manufacturers generally and, also, more detailed provisions that apply to specific automotive manufacturers. PRFOF 37. PFOF 35. One of the 7 manuals is Quality System Requirements QS–9000 ("QS 9000). The QS–9000 is the "umbrella under which the other industry manuals fall." PRFOF 38. It defines the fundamental quality system expectations of Chrysler and other sub-

scribing companies for internal and external suppliers of production and service parts and materials. PRFOF 39. The QS–9000 manual states that "QS–9000 is a contractual requirement for all supplier sites of (a) production materials, (b) production or service parts or (c) heat treating, plating, painting or other finishing services." However, the manual is open to interpretation in actual practice. PRFOF 40. CPC agreed to obtain QS–9000 certification. Dispute exists as to what date CPC agreed to obtain QS–9000 certification. In any event, CPC obtained QS–9000 certification on November 24, 1998, two months after the original Production Part Approval Process ("PPAP") date, and the day before CPC was terminated as the machining supplier. PRFOF 41.

The Advance Product Quality Planning ("APQP") manual states that "product Quality Planning is a structured method of defining and establishing the steps necessary to assure that a product satisfies the customer. The goal of the product quality planning is to facilitate communication with everyone involved to assure that all required steps are completed on time." PRFOF 44. Under APQP, "the success of any program depends on meeting customer needs and expectations in a timely manner at a cost that represents value." PRFOF 45. "The Product Quality Team is responsible for assuring that timing meets or exceeds the customer timing plan." PRFOF 46. The goal of the APQP is to facilitate communication to "assure that all required steps are completed on time." PRFOF 49. Pursuant to the DaimlerChrysler specific requirements in the QS–9000 Manual, a supplier must perform a Process Sign–Off ("PSO") prior to the PPAP submission. *Id.* 50. Similar to the PPAP, the PSO is a "systematic and sequential review of the Supplier's planned and actual manufacturing process at the quoted peak daily line rate, including man-

power, facilities equipment, material, methods, procedures, software level, and tooling." *Id.* 53. The purpose of the PSO is to "verify the Supplier's production process readiness and assure complete understanding of program requirements, with the intent to improve vehicle quality through proactive prevention." *Id.* 54. The PSO includes a line speed demonstration ("run-at-rate") by which the supplier must demonstrate to the Product Team that they are capable of producing quality parts at the quoted peak daily rate. *Id.* 55. The PSO defines "line speed" as "the contracted peak daily line speed. This line speed must be verified during the Production Demonstration Run while process performance studies are maintained at a level greater than or equal to 1.67 Ppk." *Id.* 56.

A "critical" dimension is one that, if not maintained or respected, could cause the part not to function. *Id.* 57. There were eleven critical dimensions on the 902AA differential case. The true position of the spherical radius was one of DaimlerChrysler's specified critical dimensions on the 902AA differential case. Failure to maintain the true position of the spherical radius could cause a "catastrophic failure" in that it could cause the axle to stop turning. *Id.* 59. CpK is a way to statistically describe the performance of a given process or, more specifically, the relationship between the required tolerance for the part and the natural tolerance of the process used to produce the part. *Id.* 60. CPC had to meet a 1.67 CpK for critical dimensions at PPAP. PRFOF 61. 1.67 CpK on a critical dimension is considered the standard capability requirement for critical dimensions in the automotive industry during launch at PPAP or PSO. *Id.* 61. Tom Bartosz, CPC's former Vice President of Engineering and current Director of Sales and Marketing, testified, "it's most impor-

tant" to demonstrate process capability of 1.67CpK on critical dimensions. *Id.* 64

DaimlerChrysler's required production capacity for machining the 902AA differential case castings was 50 pieces per hour. *Id.* 68. To save money, CPC wanted to delay the purchase of equipment for the 902AA differential case project. *Id.* 69. CPC asked to demonstrate the production rate and prove its production capacity by proving the rate of one machine in each operation and multiplying the number of machines performing that operation in the full production cell. PRFOF 69. In other words, in an effort to save money, CPC requested that it be allowed to complete its PPAP submission utilizing only one machine for each operation instead of the full number of machines that would be used during production. *Id.* 70. Intermet submitted this request to DaimlerChrysler, and DaimlerChrysler compromised by offering to allow CPC to complete its PPAP submission at 50% production capacity, or 25 pieces per hour. CPC accepted this compromise. PRFOF 71.

The original PPAP deadline for CPC was October 25, 1998. CPC was aware of this date since December 5, 1997. PRFOF 24. Demonstrating process capability and production capacity on or before the PPAP "milestone" date was a material term of the contract between Intermet and CPC. Hodge p. 54 1. 6–7; Schurrer, p. 234, 1.2021; Barker, p. 329, 1.7 – p. 330, 1.2 p. 337, 1.3–6; Elser, p. 1273, 1. 18–p. 1274, 1.12, p. 1278, 1. 14–24; Baxter p. 1852, 1.23 – p. 1853, 1.6; CPC's New Order Notice dated December 5, 1997, DX 619; APQP Meeting Minutes, PX 96; November 24, 1998 E-mail from Joe Elser. CPC was responsible for ordering equipment, fixtures and tooling in sufficient time to set up and debug its machining cell. PRFOF 75. CPC ordered its machinery to be delivered in April, June and August of

1998, leaving time to prepare for the October PPAP date. However, some of the machinery did not arrive until late September, 1998. *Id.*

CPC purchased a "turnkey" operation from Ellison Machinery Company. Under this operation, Ellison would be responsible for, among other things, delivering the equipment and duplicating the run-off on CPC's floor for the 902AA differential case and machining certain features. *Id.* 77. Under the contract between CPC and Ellison, Ellison had to demonstrate that the machining process was at least capable of a 1.33 CpK. Additionally, after delivery to CPC, Ellison had to demonstrate a process capability of 1.67 CpK. *Id.* 79.

On September 16, 1997, a "kick off" meeting was held among representatives of Intermet, CPC and DaimlerChrysler. *Id.* 80. At the meeting, Frank Drumheller expressed Intermet's approval of CPC and stated that he expected that CPC would contribute significantly to the 902AA differential case program. Drumheller praised CPC for its machining capabilities. *Id.* 81. Nine APQP meetings were held among representatives of Intermet, CPC and DaimlerChrysler *Id.* 82. CPC had a representative at each meeting. *Id.* 83. CPC claims that their participation in these meeting was limited by Intermet and that the essential communication process necessary for a successful launch was curtailed by Intermet. *Id.* CPC's Project Manager, Art King, frequently raised issues directly with DaimlerChrysler's Project Manager, Joe Elser, at the APQP meetings. CPC did not solely rely on Intermet to raise issues on its behalf. Mr. Elser testified that Mr. King raised issues, "almost to the point where I was kind of annoyed with Intermet because I really thought that there should have been more filtering going on by way of Intermet evaluating requests before Mr. King would

bring them up at meetings." Elser, p. 1280, 1. 1–18. Minutes of APQP meetings were regularly prepared and given to CPC, Intermet and DaimlerChrysler for their review. PRFOF 85.

At the APQP January 7, 1998 meeting, CPC's PPAP submission was scheduled for October 2, 1998. On that date, CPC was required to have "500 pieces full PPAP shipped to Chrysler/[Detroit Axle Plant]." *Id.* 89. The January 21, 1998 APQP meeting reiterated this requirement. Id. 90. At the February 19, 1998 APQP meeting, CPC's run-at-rate demonstration was tentatively set for August 20, 1998. *Id.* 92. DaimlerChrysler Detroit Axle Plant requested at that meeting that the PPAP submission scheduled for the AN/DN axle program be accelerated so it could qualify its own equipment and processes in a timely manner. *Id.* 93. As a result, Daimler-Chrysler accelerated the PPAP dates for *all* of its suppliers on the AN/DN axle program including Intermet and CPC. *Id.* 94. At the February 19, 1998 APQP meeting, DaimlerChrysler requested that CPC's PPAP submission date be moved up from October 2, 1998 to September 8, 1998. DaimlerChrysler explained the reasons for the request to the APQP team. *Id.* 95.

On February 20, 1998 a meeting was held with representatives of CPC and Intermet. CPC's then-President Ken Barker, then-Vice President of Operations Ron Schurrer, and Project Manager Art King attended the meeting. At the meeting CPC was informed that DaimlerChrysler was narrowing its supply base and it was noted that CPC was not on DaimlerChrysler's approved supplier list. *Id.* 98. CPC was also advised by Intermet that a representative of DaimlerChrysler (not involved with the project) had apparently had some reservations about CPC due to a payment issue that had arisen between Daimler-Chrysler and CPC a few years prior on a

unrelated job. This previous issue with DaimlerChrysler and CPC had nothing to do with the quality of the machining service provided by CPC. Intermet talked with DaimlerChrysler to assure that the prior unrelated billing issue would not be a problem. *Id.* 99. At the March 19, 1998 APQP meeting, DaimlerChrysler formally requested that CPC's PPAP submission date be moved up from October 2, 1998 to September 16, 1998. CPC did not commit to this date but agreed to work toward an earlier date. *Id.* 102. At the April 16, 1998 APQP meeting, CPC agreed to move their PPAP submission date ahead from October 2, 1998 to September 28, 1998. *Id.* 103. CPC failed to meet this PPAP date.

## II. ANALYSIS

■ CPC claims that Intermet breached the contract when it terminated CPC and contracted with Linimar to perform the machining. Intermet asserts that it was protecting its interests in terminating CPC because CPC had not proven production capability by the established Daimler-Chysler deadline and had not provided Intermet with any reasonable assurances of its ability to perform. The lack of a successful PSO/PPAP by the date agreed upon was a breach of the contract that defeated the object of the contract.

The contract to machine the 902AA differential case was formed on December 5, 1997 when Intermet gave CPC a verbal purchase order based on CPC's June 3, 1997 quotation. PFOF 92. The contract was silent as to the requirements for PPAP. However, that requirement was established through industry practice, which calls for automotive suppliers to obtain PPAP approval before production begins. RDFOF 35–36, 48; PFOF 15–17. The initial PPAP date is set to allow for time to cure defects before production commences.

Here, CPC did not meet the PPAP requirements of 1.67 CpK after working on the contract for over 14 months and after several opportunities to meet this PPAP requirement.

At the time of the termination of the contract, CPC could not give a full assurance that it would meet the 1.67 CpK by the time of production. While CPC assured compliance with the requirements for the critical dimensions such as the true position of the spherical radius by inspecting 100% of the parts, this is not the equivalent of meeting 1.67 CpK at PPAP. CPC claims that this type of checking is standard in the industry and therefore their failure to meet the PPAP dates does not amount to a material breach. The Court disagrees. Because of the tight time frames and the limited room for error in the automobile manufacturing process, and the intense pressure that comes with the need to guarantee a quality product that the rest of production relies on, CPC's failure to meet the PPAP date was a breach of the contract that justified Intermet's termination of the contract and the resourcing of the work to Linimar.

## A. Standard in the Industry

CPC's claim that Intermet had an ulterior motive in demanding that CPC meet the pre-production demonstration of process capability and production capacity is not supported by the evidence. These tests are required for each supplier and each supplier other than CPC proved capability. CPC was asking to be an exception. The PPAP date was agreed upon by DaimlerChrysler, Intermet and CPC. DPFOF 89–119, 122, 127, 132. Additionally, documents in evidence and every witness who testified on the subject characterized the PPAP date as a "material," "critical," "important," or "milestone" date. DFOF 74. Although it is true that certain provisions in the manuals are flexible in accordance with industry standard, meeting PPAP was not one of them. Importantly, the part that CPC was machining was a critical feature on the vehicle. The failure to maintain the true position of the spherical radius could cause a "catastrophic failure" in that it could cause the axle to stop turning. *Id.* 59. As stated previously, CpK is a way to statistically describe the performance of a given process or, more specifically, the relationship between the required tolerance for the part and the natural tolerance of the process used to produce the part. *Id.* 60. CPC had to meet a 1.67 CpK for critical dimensions at PPAP which it could not accomplish. PRFOF 61. Additionally, Art King, CPC's product manager, was unable to give Intermet assurances that it could meet PPAP at the time of production.

## B. Material Breach

Under Wisconsin contract law "[f]or a breach to be material, it must be so serious as to destroy the essential object of the agreement." *Ranes v. American Family Mutual Ins. Co.*, 219 Wis.2d 49, 57, 580 N.W.2d 197 (1998) (citing *Appleton State Bank v. Lee*, 33 Wis.2d 690, 148 N.W.2d 1 (1967)). Wisconsin follows the Restatement approach, which sets forth various factors for courts to use when facing a material breach issue. These include the extent to which the injured party will be deprived of a reasonably expected benefit, the extent to which the injured party can be adequately compensated, and circumstances suggesting whether or not the breaching party will cure, including adequate assurances. Restatement (Second) of Contracts § 241 (1979).

CPC failed to meet contract commitments. CPC canceled previously agreed upon PPAP dates on September 9, 10, and

15. CPC failed the September 29–30 PPAP which was the originally agreed upon PPAP date. CPC additionally failed to cure the October 29 and 30 Audit even though Intermet allowed CPC to bank parts to account for missing equipment. On November 24, 1998, CPC submitted a 34–piece study that did not show process capability of 1.67 CpK with respect to the true position of the spherical radius. It is undisputed that the contract between Intermet and CPC required CPC to demonstrate process capability of 1.67 CpK with respect to all of DaimlerChrysler's critical dimensions, including the true position of the spherical radius. DFOF 201. Intermet allowed CPC several opportunities to cure the breach but CPC was unable to do so. Additionally, the 34–piece study did not show that it could reach PPAP requirements. After CPC failed the PPAP on the third scheduled date, DaimlerChrysler was appropriately concerned. Elser, p. 1299, 1.13–16. CPC's failure to meet milestone dates such as PPAP affected DaimlerChrysler's own internal milestone dates. Id. at 1290, 1.22—1291. The launch date with DaimlerChrysler was April 2, 1999. On November 25, 1998, Intermet wrote CPC notifying them that they were terminated as the machining supplier on the 902AA differential case project and resourcing the contract to Linemar.

James Peterson was Intermet's Vice President of Foundry Operations and authorized CPC's termination. By the time of trial, Peterson had become Vice–President of CPC's parent company, Citation Corporation. While Peterson testified that he would have taken a harder look at his decision to terminate CPC had he been aware that CPC could not reach 1.67 CpK on only two of the 11 critical dimensions and that Art King was confident that he could solve one of these problems, this statement does not change the fact that a material breach had already occurred. There was no guarantee that one of the problems could be solved by means other than 100% checking. While CPC earnestly worked on the problem, Intermet was under pressure to meet its contractual launch deadline with DaimlerChrysler. If Intermet missed the launch date with DaimlerChrysler it was subject to severe monetary penalties for every minute the production line was delayed in addition to a potential business penalty. DaimlerChrysler was Intermet's largest and most important customer. Intermet would have been deprived of the reasonably expected benefits of its contract with DaimlerChrysler if it had not terminated its contract with CPC. Accordingly, CPC was correct in resourcing the contract. *See Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis.2d 158, 184, 557 N.W.2d 67 (1996).

C. *Good Faith and Fair Dealing*

▮▮▮ CPC alleges that Intermet violated the covenant of good faith and fair dealing when it lulled CPC into a false sense of security by repeatedly assuring it, in word and deed, that it would not resource as long as CPC was making progress. In October, 1998, three letters from Intermet officers C. James Peterson and Mike McShane were sent to CPC notifying CPC that it was in breach of the contract, giving CPC an opportunity to cure its breach, advising CPC what it must do to cure and stating that the contract would be terminated if it failed to cure. DFOF 154, 164, 171; DRFOF 63–65. Intermet did not agree to waive any of the capability and capacity requirements and CPC never asked Intermet to waive any of these requirements. DFOF 156–159, 168–170; DRFOF 67–68. The implied covenant of good faith and fair dealing is breached when a party's conduct is " 'arbitrary and

unreasonable.'" *Chase Lumber and Fuel Company, Inc. v. Chase,* 228 Wis.2d 179, 596 N.W.2d 840, 846 (Ct.App.1999) (citing *Foseid v. State Bank,* 197 Wis.2d 772, 541 N.W.2d 203, 213 (Ct.App.1995)). Given the intense nature of this business environment where time frames are critical and the need for assurances absolute, a breach of this standard was not established.[1]

### D. *Intermet's Counterclaim for Breach of Contract*

█ Intermet claims that it incurred $96,156.00 in damages as a result of CPC's failures and costs of resourcing the contract to Linemar. A one-sentence statement of these damages is found in Intermet's Proposed Findings of Fact, and an expert report is also submitted. No legal analysis as to why Intermet should be awarded these damages is made. A review of the evidence forces the Court to find that Intermet has failed to meet its burden as to damages associated with resourcing.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

1. Plaintiff Custom Products Corporation's request for damages is DENIED;

2. Defendant Intermet Corporation's request for damages is DENIED.

---

**1.** CPC claims that the covenant was breached when Intermet required CPC to pay for castings that the contract required it to supply free of charge. CPC requested these additional castings *after* it had failed to meet a material obligation under the contract. The Court therefore finds no breach on Intermet's part because of that requirement. CPC has not established the elements of a breach of the covenant of good faith and fair dealing.