In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3333

SID TILSTRA and TILSTRA DAIRY EQUIPMENT, LTD.,

*Plaintiffs-Appellees*,

*v.*

BOUMATIC LLC,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:12-cv-00827-slc — **Stephen L. Crocker**, *Magistrate Judge*.

ARGUED APRIL 17, 2015 — DECIDED JUNE 30, 2015

Before POSNER and WILLIAMS, *Circuit Judges*, and WOOD, *District Judge*.[*]

POSNER, *Circuit Judge*. This diversity suit pits a dealer in dairy ("milking parlor") equipment (the corporate plaintiff, owned by Sid Tilstra, the other plaintiff, but to simplify we'll pretend that Mr. Tilstra is the only plaintiff) in southwestern

---

[*] Hon. Andrea R. Wood of the Northern District of Illinois, sitting by designation.

Ontario against a manufacturer of such equipment, Bou-Matic, a Wisconsin company. The parties agree that the law applicable to the substantive issues in this case is Wisconsin law; their contract authorized BouMatic to designate either Wisconsin law or the law of the jurisdiction in which the dealer is located as the law to govern a dispute between the parties, and it chose Wisconsin law.

Tilstra had been a dealer in BouMatic's dairy equipment for about twenty years. He claims that by devious means, violating the rule of contract law that contracts be performed in good faith, BouMatic forced him to sell his dealership to a neighboring BouMatic dealer at a below-market price. The jury agreed and awarded Tilstra $471,124 in damages, which the magistrate judge (presiding by agreement of the parties) upheld over the objections of BouMatic, which has appealed.

Each BouMatic dealer is assigned a territory within which he has the exclusive right to sell and service BouMatic products. Tilstra's territory included (according to John Ghey, the BouMatic district sales manager whose domain included that territory) "arguably the richest dairy county in Canada," on which 55,000 dairy cows grazed. His dealership was making a profit of about $400,000 a year.

The dealership contract reserved to BouMatic "the right to change, at its sole discretion, the assigned territory," but further provided that "BouMatic shall not terminate this [dealership] Agreement or effect a substantial change in the competitive circumstances of this Agreement without good cause and only upon at least ninety (90) days' advance written notice sent by certified mail. The term 'good cause' means Dealer's failure to comply substantially with essential

and reasonable requirements imposed upon Dealer by Bou-Matic."

Adjacent to Tilstra's territory was another BouMatic territory, this one assigned to a dealership that the parties call Dortmans. Dortmans' territory grazed only about half the number of dairy cows as Tilstra's. Dortmans wanted to buy Tilstra's dealership in order to obtain his territory. But the two were unable to come to terms—Tilstra was demanding a much higher price than Dortmans was willing to pay. A BouMatic district sales manager, Ghey, whose district included both territories, advised his superiors that Tilstra was doing a poor job with his territory; whether this was true is unclear, but in 2009, BouMatic's regional sales manager, Stephane Desjardins, advised Ghey by email that "We [should] approach Sid [Tilstra] again and ask him to sell. If he refuses or makes it too difficult, we would in the short term, modify the territory lines in favor of Advanced [another adjacent BouMatic dealer] and Dortmans. This would … put unbearable pressure on Sid [to sell]—without cancelling him outright or immediately."

Desjardins and Ghey met with Tilstra and told him that BouMatic would eliminate his territory altogether unless he agreed to sell his dealership, with all its assets, to the Dortmans by the first of the next month (December 2009), the sale to be closed by January 1. There is evidence that BouMatic also threatened to stop selling dairy equipment to Tilstra.

Tilstra was willing to sell his dealership, but he continued to resist the terms offered by Dortmans. On January 8 BouMatic's North American Director of Sales sent Tilstra a letter reminding him that BouMatic had decided to "have Dortmans … take over the territory covered by your com-

pany. … [O]ur decision … is not negotiable and … we will proceed with or without your cooperation." The following month Tilstra sold the dealership to Dortmans for $500,000 plus a five-year consulting contract under which he would receive a total of $310,000 in consulting fees. The sale was completed in March.

Tilstra had valued the goodwill of his dealership at $1.5 million; BouMatic, siding with Dortmans, had forced him to sell it for half that amount even when the consulting contract awarded to Tilstra as part of the deal is deemed part of the price of the dealership. In this suit, brought some two and a half years later, Tilstra argues that BouMatic both violated the dealership agreement and improperly interfered with his negotiations with Dortmans; but the latter claim was dismissed as untimely, leaving only the former.

The jury was entitled to find that BouMatic, though it did not purport to terminate its contract with Tilstra, in fact terminated it, and did so without complying with the provision, quoted earlier, forbidding termination "without good cause and only upon at least ninety (90) days' advance written notice sent by certified mail." True, BouMatic didn't formally terminate the agreement. But by telling Tilstra that unless he sold out to Dortmans his territory would be shrunk to zero, BouMatic was telling him that he was finished, his dealership doomed; for without a territory his position as a BouMatic dealer would be untenable. The territorial clause of the dealership agreement provides that the "Dealer shall purchase Bou-Matic products only … for resale to purchaser-users in Dealer's assigned territory … [and] shall solicit sales only in their assigned territory unless allowed by Bou-Matic in writing prior to any solicitation." So

if Tilstra's territory were eliminated, Tilstra wouldn't be able to buy any products from BouMatic for resale to anyone, or solicit any sales from anyone. In other words, no territory, no dealership. BouMatic ripostes that, as also quoted earlier, the dealership contract reserved to it "the right to change, at its sole discretion, the assigned territory." Elimination of a dealership's entire territory is certainly a change, but were it a change permitted by the contract, it would amount to allowing termination "without good cause," contrary to an explicit contract term. That would not be a tenable interpretation of the contract.

Contract law imposes on both parties to a contract a duty of good faith in the performance of their contractual obligations. E.g., *In re Estate of Chayka*, 176 N.W.2d 561, 564 (Wis. 1970). One form of bad faith that Wisconsin law recognizes is "evasion of the spirit of the bargain," *Foseid v. State Bank of Cross Plains*, 541 N.W.2d 203, 212 (Wis. App. 1995)—an apt description of BouMatic's de facto termination ("constructive termination" is the conventional legalism) by taking away a dealer's entire territory. Another form of bad faith recognized in Wisconsin law is "abuse of a power to specify terms" (in this case to specify the size and shape of the dealer's territory). *Id.* at 213, quoting (as in our earlier quotation from the *Foseid* opinion) *Restatement (Second) of Contracts* § 205, comment d (1981); see also *Zenith Ins. Co. v. Employers Ins. of Wausau*, 141 F.3d 300, 308 (7th Cir. 1998) (Wisconsin law). An internal email by Desjardins accurately describes what BouMatic was trying to do to Tilstra (and succeeding) as "cancellation."

Backhandedly conceding the point, BouMatic argues that it had good cause to terminate Tilstra. But it never told Til-

stra that, as required by the contract, or proved at trial that Tilstra had failed "to comply substantially with essential and reasonable requirements imposed upon [Tilstra] by Bou-Matic." No doubt BouMatic thought it would make more money if Dortmans rather than Tilstra managed what had been Tilstra's territory. But the dealership contract did not authorize BouMatic to terminate a dealer merely because it had found a substitute that it thought it could make more money from. That would have made the contract terminable at will by BouMatic. The dealership agreement specifies that Tilstra may terminate it at will but BouMatic may terminate only if it has good cause to do so.

With regard to remedy, BouMatic fires a blunderbuss of objections to the calculation of damages by Tilstra's expert, a certified management accountant (with four other professional certifications as well) named Rinaldo Sciannella. BouMatic points out that Sciannella did not attempt to verify Tilstra's financial statements prepared in the ordinary course of business (that is, unrelated to the litigation) by outside accountants. But an expert witness is not required to verify all the facts on which he relies; he can rely on hearsay (in this case, what the accountants stated in the financial statements) provided that such reliance is an accepted practice in his profession, as it is. Fed. R. Evid. 703. BouMatic also points to a provision in its dealership agreement with Tilstra that "regardless of which party terminates this Agreement, Dealer shall not be entitled to any termination compensation or to any compensation for goodwill." But the section of the agreement in which this provision appears conditions Bou-Matic's right to terminate a dealer on good cause and 90-day written notice, and BouMatic did not comply with those conditions and so cannot rely on the provision we quoted. It

broke its contract with Tilstra, thereby exposing itself to a liability that would have been excluded only if BouMatic had terminated Tilstra's dealership for good cause.

BouMatic objects that the expert assumed that had Tilstra not been terminated, his dealership would have remained as valuable as it had been in recent years, and BouMatic regards this as mere speculation. But the damages calculated by the expert under the rubric of "goodwill" were the sum of the discounted future earnings of the dealership based on that assumption, and that is a standard method of business valuation, known as the "capitalized earnings" approach.

BouMatic points out that even if it couldn't lawfully shrink Tilstra's territory to zero, it could shrink it some, and that would reduce Tilstra's dealership profits. But the jury was entitled to find that any shrinkage attempted by BouMatic would have been a further attempt to transfer the dealership to Dortmans without complying with the contractual provisions governing termination or with the duty of good faith performance imposed by contract law. BouMatic also argues that Tilstra could have obtained a comparable dealership from another supplier of milking-parlor equipment, or remained independent. But there was evidence that it is difficult to secure a new dealership and that a dealership is necessary to remain competitive—indeed, without a dealership and thus an assured source of supply of milking-parlor equipment, Tilstra might be relegated to manufacturing its own such equipment, which would hardly be a realistic option.

BouMatic has other complaints about Sciannella as well, but they too go not to the admissibility of Sciannella's testimony but to its weight. BouMatic had the opportunity to

discredit Sciannella's testimony before the jury, tried to do so, and succeeded in persuading it to award Tilstra only about half the damages calculated by Sciannella.

The judgment of the district court is

                                                        AFFIRMED.