In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-4109

INDIA BREWERIES, INC.,

*Plaintiff-Appellant*,

*v.*

MILLER BREWING COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05 C 467—**Charles N. Clevert, Jr.**, *Chief Judge.*

ARGUED MAY 21, 2010—DECIDED JULY 21, 2010

Before EASTERBROOK, *Chief Judge*, and BAUER and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* India Breweries, Inc. ("IBI") and Miller Brewing Co. ("Miller") entered into a license agreement that would have permitted IBI to brew and distribute three Miller-branded beers in India. Miller executives visited India to inspect two breweries IBI wanted to use to brew the beer and rejected them as unsanitary and lacking in equipment. Miller refused to

return to India to inspect more breweries until IBI assured it that the breweries had the minimum equipment necessary to brew Miller beer. IBI brought suit for breach of contract, alleging that Miller had a contractual duty to inspect any brewery it proffered and failed to act in good faith in refusing to make inspections. Miller counterclaimed, alleging that IBI fraudulently induced it into entering the license agreement and misrepresented its financial status. The district court granted summary judgment to Miller on IBI's claims, and IBI appealed. Miller (belatedly) agreed to dismiss its counterclaims with prejudice, giving us jurisdiction over the case, and we now affirm.

## I. Background

IBI is a Canadian company that acts as a "virtual brewer"—it acquires rights to various beers and enlists or partners with other entities to actually brew and distribute the beers. In 1997, IBI entered into a joint venture with Indian brewery and distillery Mohan Meakin, Ltd. ("Mohan") to brew and distribute beer in India. The joint venture company was known as International Breweries Pvt., Ltd., or "IBP," and was incorporated in India.

In 1998, IBI approached Miller, the manufacturer of popular beers such as Miller Genuine Draft, Miller Lite, and Milwaukee's Best and at that time a Wisconsin-based company, to seek the rights to brew Miller beer as part of the IBP joint venture. Miller provided IBI with a list of the minimum equipment necessary for the pro-

duction of its beers, and IBI informed Miller that it and Mohan planned to upgrade Mohan's brewery in Delhi, India, to meet Miller's specifications. After some lengthy back and forth, Miller and IBI entered into a formal license agreement on September 22, 1999.

IBI initially proposed manufacturing Miller beer at two Mohan breweries, one in Delhi and one in Madras (Chennai). Miller sent a team of executives, headed by Giorgio Sega, its Director of International Operations, to inspect the two breweries in October 1999, pursuant to paragraph 2.5 of the license agreement, the pertinent language of which reads:

> With respect to each brewery where a Licensed Beer is to be brewed, IBI (after consultation with and in-spection by Miller) will conduct (or cause to be con-ducted) commercial scale test brews of each Recipe that is to be used at that brewery. Prior to beginning commercial brewing of each Licensed Beer at the brewery in the Territory, IBI will obtain Miller's written approval of the brewery and the Licensed Beer(s) made at that brewery. As defined herein, "commercial brewing" shall mean production of Licensed Beer(s) for sale. Where brewing is to be performed by a sublicensee or a contract brewer, no such sublicensed or contract brewing-brewing [sic] may take place unless Miller has approved in writing the brewer, the brewery, the confidentiality protec-tion relating thereto, and the terms of the sub-licensing/contract brewing relationship. . . .

Sega concluded that both the Delhi and Madras brew-eries were "rudimentary in technology and lacking mini-

mum standards of process; quality assurance; basic food plant hygiene; and Good Manufacturing Practices." He advised IBI that it would probably take seven to ten months and significant capital outlays to upgrade the Delhi and Madras breweries. IBI ultimately concluded that rehabilitating the breweries would be impracticable, and began exploring other brewing options.

On January 11, 2000, IBI wrote to Miller that it was "seriously investigating the possibility of upgrading" another Mohan-owned brewery, Artos, and was "considering" an unnamed brewery in "Western India." IBI provided Miller with some of Artos's technical specifications at that time, and informed Miller that it would be in touch to arrange an inspection visit "[o]nce we have completed the purchase agreement."

No purchase agreement for Artos was ever signed, and there is no evidence indicating that IBI formally requested an inspection of the facility, though it contends that it made several oral requests to that effect. Instead, on March 1, 2000, IBI told Miller that it had completed a purchase agreement for a non-Mohan brewery, Rajasthan, the brewery in western India to which it had previously alluded. (IBI maintains that it shifted its focus to Rajasthan at Miller's request.) In the March 1 e-mail to Miller, IBI emphasized that Rajasthan was "being purchased specifically for producing the Miller brands [so] it is important that you approve the plant before we proceed any further." Miller responded by forwarding IBI information about its brewing standards and the minimum equipment that would be required to

meet them. In that response, Sega also explained that he would schedule a visit to the Rajasthan brewery only after receiving IBI's "assurance that systems; equipment; hygiene; process and packaged product procedures and specifications can be met at your prospective brewer, and that there is a total commitment to purchase and install what is missing." IBI told Miller it would forward the equipment guidelines to Rajasthan's brewmaster and would wait for him to make an assessment of the brewery before making arrangements for another Miller inspection.

Six months later, in September 2000, IBI was still having problems finalizing the Rajasthan deal. It wrote to Miller and explained that it was now trying to enter into a contract brewing arrangement rather than a purchase agreement with Rajasthan. Under such an arrangement, Rajasthan would remain independent and would brew beer for IBI (or IBP) pursuant to a negotiated contract. IBI noted that Rajasthan was "the best brewery in South Asia according to Ernst & Young," but nonetheless expressed some uncertainty as to whether it could meet Miller's standards. To that end, IBI further informed Miller that it was "in discussion with several other breweries in India (in Himachal Pradesh, Haryana, and Karnatka states) for contract brewing or purchase deals." It did not provide further details about those other breweries—such as names or technical specifications—at that time.

By November 2000, IBI had not yet entered into a formal contract to purchase a brewery or otherwise

produce beer in India. But IBP (the IBI-Mohan joint venture) had entered into two memoranda of understanding ("MOUs"), one with Rajasthan and another with one of the "other breweries" it referenced in September, Him Neel, pursuant to which it pledged to work in good faith toward purchasing assets from those breweries. Both MOUs also envisaged contract brewing between IBP and the respective breweries, though the Rajasthan arrangement was conditioned on the brewmaster's approval and was never executed, and the Him Neel MOU was by its terms "neither a commitment nor binding." Neither MOU contemplated the terms of these possible contract brewing relationships. Nevertheless, on November 7, IBI told Miller that it had entered agreements with both Rajasthan and Him Neel for the immediate production of Miller beer. Miller responded by asking IBI for copies of the contracts, as well as equipment lists for Rajasthan and Him Neel. It also reminded IBI that an inspection of the breweries would be contingent upon the "presence and operation of process equipment required for the production of Miller brands and the ability to meet Miller's quality standards."

Despite experiencing difficulty obtaining detailed equipment lists for breweries it did not own, IBI quickly procured and sent to Miller some technical specifications for the Rajasthan brewery. Miller reviewed the specifications and concluded that Rajasthan lacked necessary equipment. On November 28, Miller told IBI that Rajasthan was an unacceptable facility. Sega reiterated this assessment in a December 12 letter he sent to another Miller executive, William Berg. In that letter, Sega

stated that Rajasthan lacked "basic equipment we would require for high gravity brewing[1] and processing of any and all of our brands, as well as basic equipment we'd require to meet our packaging standards. Since this equipment is lacking at Rajasthan, I see no benefit i[n] visiting the brewery at this time. No equipment list is available for the Him Neel brewery, so there is no sense in visiting that plant either."

IBI eventually managed to secure the Him Neel equipment list and provided it to Miller on December 22, 2000. Though Him Neel was a modern, European-designed brewery, it lacked a centrifuge, which is not necessary for beer production in general but is critical to Miller's proprietary production process. Sega sent another internal letter to Berg, in which he declared Him Neel unacceptable and noted that it lacked "basic equipment we would require for high gravity brewing and pro-

---

[1] High gravity brewing is a process by which beer is brewed at a high alcohol concentration and diluted down to the desired strength near the end of production. It allows breweries to brew more beer without increasing the physical capacity of their plants. The parties dispute whether India permitted high gravity brewing, and IBI (who contends that it did not) challenges Miller's alleged reliance on breweries' lack of high gravity production equipment in deeming the proffered breweries unacceptable. (The record shows that Miller told IBI that brewing at standard gravity in India would not be a problem.) We need not resolve this dispute, because Miller provided adequate alternative grounds for declining to inspect the breweries.

cessing of our brands, as well as basic equipment we'd require to meet and to monitor compliance with our process[,] microbial and packaging standards." Miller relayed this assessment to IBI on January 5, 2001, several days after the Miller-drafted license agreement automatically terminated for want of IBI's ownership of a brewery or demonstration of a contract brewing agreement. *See* Agreement ¶ 5.1(g). (Miller told IBI that it would be willing to extend the termination deadline if IBI agreed to meet four conditions, but IBI declined the offer.)

IBI filed a breach of contract action against Miller in the Eastern District of Wisconsin in April 2005, properly invoking diversity jurisdiction. It contended that paragraph 2.5 of the license agreement imposed upon Miller a duty to physically inspect any brewery it proffered, and that in failing to do so Miller acted in bad faith and prevented it from upholding its own end of the bargain and realizing significant profits. It also raised a second breach of contract claim that it later abandoned; that claim is irrelevant here.

Miller responded by filing counterclaims against IBI, alleging that IBI fraudulently induced it to enter into the license agreement in the first place and negligently misrepresented its assets and financial standing. Miller also moved for summary judgment on IBI's claims. The district court granted Miler's motion. It concluded that paragraph 1.2 of the license agreement established a distinction between two types of breweries that carried through the remainder of the forty-page agreement: those

owned by IBI, IBP, a wholly owned subsidiary of IBP, or Mohan, and those owned by anyone else. Breweries in the first group were subject to a reasonableness requirement, the district court concluded; that is, Miller could only reject them for good reason. The latter group, to which both Rajasthan and Him Neel belonged, could be rejected on any grounds, regardless how unreasonable. The district court determined that Miller properly rejected Him Neel and Rajasthan, and that IBI had abandoned its pursuit of Artos. It granted summary judgment to Miller, but not before correctly noting that Miller's counterclaims remained pending.

After the district court ruled in its favor on IBI's claims, Miller moved for summary judgment on its counterclaims. The district court determined that material issues of fact remained and accordingly denied Miller's motion. Later, Miller and IBI entered into a stipulation under which they agreed to "the dismissal of Miller's Counterclaims without prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii)." IBI then filed this appeal.

## II. Discussion

### A. Appellate Jurisdiction

Before we may proceed to the merits of IBI's appeal, we must address the threshold issue of our jurisdiction to hear the case. *Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, 600 F.3d 878, 883 (7th Cir. 2010); *Horwitz v. Alloy Auto. Co.*, 957 F.2d 1431, 1435 (7th Cir. 1992) ("It is our threshold and independent obligation to make

that determination . . . ."). For this court to have juris-
diction on appeal under 28 U.S.C. § 1291, the judgment
of the district court below must be final. *Nat'l Inspection
& Repairs*, 600 F.3d at 883. An order is final for purposes
of § 1291 if it "ends the litigation on the merits and leaves
nothing for the [district] court to do but execute the
judgment*." Catlin v. United States*, 324 U.S. 229, 233 (1945);
*BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572
F.3d 353, 357 (7th Cir. 2009).

In its stipulation with IBI, Miller agreed not to refile
its counterclaims, "except in the event IBI successfully
appeals the dismissal of IBI's Claims, in part or in whole,"
and IBI agreed to waive "any affirmative defense that
might potentially arise as a direct or indirect result of
the stipulated dismissal." The parties further agreed that
if the district court's decision were reversed and the
case remanded, Miller would have sixty days in which
to refile the counterclaims. IBI's acquiescence to the
potential resurrection of these claims perhaps kept the
peace but destroyed finality. "[T]he dismissal of one
claim or theory without prejudice, with a right to
reactivate that claim after an appeal on the remaining
theories, makes the judgment non-final." *Nat'l Inspection &
Repairs*, 600 F.3d at 883 (quoting *First Health Group Corp. v.
BCE Emergis Corp.*, 269 F.3d 800, 801 (7th Cir. 2001)). This
is the case no matter which party holds the revivable
claims. If the parties' dispute has not been fully resolved
by the district court, the "remaining elements are apt
to come back on a second appeal," and the decision
cannot be considered final. *First Health*, 269 F.3d at 801.

Parties cannot stipulate around § 1291's finality require-ment. *Union Oil Co. of Cal. v. John Brown E&C*, 121 F.3d 305, 309 (7th Cir. 1999). They should instead direct their energies to fully extinguishing all lingering claims before they attempt to invoke the jurisdiction of this court, for failure to hew to the finality requirement frequently results in the dismissal of appeals. *See, e.g.*, *Mercado v. Dart*, 604 F.3d 360 (7th Cir. 2010); *Kerr-McGee Chem. Corp. v. Leftron Iron & Metal Co.*, 570 F.3d 856 (7th Cir. 2009). The finality rule is only rarely a "Swiss cheese." *Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 732 (7th Cir. 2010). Here, however, Miller managed to wedge through one of its narrowest holes by unequivocally dismissing its counterclaims with prejudice after we pressed the matter at oral argument. *See Nat'l Inspection & Repairs*, 600 F.3d at 883-84; *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 776-77 (7th Cir. 1999). We conse-quently have jurisdiction over this appeal and ac-cordingly proceed to the merits.

## B. Breach of Contract

The district court granted Miller summary judgment on IBI's breach of contract claim. We review that grant de novo, *e.g., Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010), applying the substantive law of the state of Wisconsin, *see Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007). We affirm if, after viewing all facts in the light most favorable to IBI, the non-movant, and drawing all reasonable inferences in its favor, we find that no

genuine issue of material fact exists and Miller is entitled to judgment as a matter of law. *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009); *see also* Fed. R. Civ. P. 56(c). That is, summary judgment is warranted if there are no genuine issues of material fact with respect to the interpretation of the license agreement; ambiguity with respect to a material matter precludes summary judgment. *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006).

Under Wisconsin law, contractual provisions are considered ambiguous when they may reasonably be taken in more than one sense. *Sipple v. Zimmerman*, 159 N.W.2d 706, 713 (Wis. 1968). IBI argues that paragraph 2.5, reproduced in pertinent part above, meets this definition. Specifically, IBI contends that its interpretation of paragraph 2.5 is equally as reasonable as that advanced by Miller and embraced by the district court, and that it is for a jury to decide which interpretation the parties intended. The problem with this argument is that IBI's interpretation of paragraph 2.5—the sole provision of the forty-page license agreement about which it makes any substantive contention—is patently unreasonable.

The first sentence of paragraph 2.5, on which IBI hangs its hat, states, "With respect to each brewery where a Licensed Beer is to be brewed, IBI (after consultation with and inspection by Miller) will conduct (or cause to be conducted) commercial scale test brews of each Recipe that is to be used at that brewery." IBI takes this to mean that Miller had a duty to "inspect <u>any</u> brewery at which IBI wants to brew a Licensed Beer(s)." Appellant's

Br. 34. "Any" is the critical word, as IBI contends that the "only constraint in the first sentence is which of the Licensed Beers IBI wanted to brew and where." *Id.* Thus, from IBI's perspective, Miller was contractually required to travel to any brewery IBI selected, even if IBI and Miller both knew it was lacking fundamental equipment that would preclude its approval and necessitate future inspections; Miller could not review on paper the brewery's specifications to ensure that it could satisfy the minimal production requirements before sending employees halfway around the world to physically examine the facility.

"The presumption in commercial contracts is that the parties were trying to accomplish something rational. Common sense is as much a part of contract interpretation as is the dictionary or arsenal of canons." *Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1120 (7th Cir. 2002) (quotation omitted); *see also Bitker & Gerner Co. v. Green Inv. Co.*, 76 N.W.2d 549, 552 (Wis. 1956) ("So far as reasonably practicable it [a contract] should be given a construction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties."). A requirement that Miller fly to India to inspect a brewery it knows would fail the inspection is not rational in any sense of the term, least of all commercially. It would be particularly irrational for IBI, a fledgling business that was contractually obligated to bear Miller's travel expenses. *See* Agreement ¶ 2.4(c). Contractual language "is to be interpreted consistent with what a reasonable person would understand the words to mean under the circumstances."

*Seitzinger v. Cmty. Hosp. Network*, 2004 WI 28, ¶ 22, 270
Wis. 2d 1, 15, 676 N.W.2d 426, 433. The only way a rea-
sonable person, or a reasonable jury, could understand
the license agreement in the way IBI wishes us to is to
construe "inspection" as nothing more than a formalistic
rubber stamp. That way, it would make sense for IBI to
have Miller conduct an inspection as soon as it located a
brewery, and would be problematic for Miller to refuse
to do so because the brewery lacked equipment neces-
sary to brew its beer.

But reading "inspection" as a rubber-stamp requirement
to be applied to any brewery IBI rustled up does not
make sense under the circumstances or in the broader
context of the agreement. In Wisconsin, "[i]t is a cardinal
rule of contract construction that the meaning of a par-
ticular provision in a contract is to be ascertained with
reference to the contract as a whole." *Crown Life Ins. Co. v.
LaBonte*, 330 N.W.2d 201, 206 (Wis. 1983). And the agree-
ment here unambiguously permits Miller to reject on
any grounds any brewer or brewery that is not closely
affiliated with IBI; pursuant to paragraph 1.2, "nothing
herein requires Miller to approve a sublicensee other
than IBP, or a contract brewer other than IBP, an IBP
wholly-owned subsidiary, and/or Mohan." If Miller can
unilaterally disapprove a brewery, and can prevent any
sublicensed or contract brewing from taking place until
it "has approved in writing the brewer, the brewery, the
confidentiality protection relating thereto, and the terms
of the sublicensing/contract brewing relationship," Agree-
ment ¶ 2.5, it makes no sense to require it to inspect

proffered breweries that will assuredly—and objectively—come up short.

Moreover, both Rajasthan and Him Neel[2] were non-IBI-affiliated breweries with which IBP sought contract brewing arrangements. They were therefore subject to the restrictions of the fourth sentence of paragraph 2.5, which by its plain terms required IBI to get Miller's express written approval of the contract brewing arrangement before conducting any brewing: "*no* such sublicensed or contract brewing-brewing [sic] may take place unless Miller has approved in writing . . . the terms of the sublicensing/contract brewing relationship." Agreement ¶ 2.5 (emphasis added). The agreement defined "commercial brewing" in the previous sentence, so the

---

[2]  We disregard IBI's argument about Artos, which is forfeited because IBI failed to properly raise it before the district court. *See Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008) ("[I]t is axiomatic that an issue not first presented to the district court may not be raised before the appellate court as a ground for reversal." (quoting *Christmas v. Sanders*, 759 F.2d 1284, 1291 (7th Cir. 1985))). IBI claims that it "raised Artos" at various junctures before the district court, Reply Br. 18, but mentioning a fact in one's answer to counterclaims, as part of a 200+ paragraph Proposed Findings of Fact, and in passing in a declaration does not amount to articulating a substantive argument for the district court's meaningful consideration, *see Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006) ("By failing to raise [an argument] *in his brief opposing summary judgment*, he lost the opportunity to urge it in both the district court and this court." (emphasis added)).

lack of specification in this sentence is indicative of the parties' intent to restrict all varieties of sublicensed and contract brewing, including the pre-commercial test brews that had to be preceded by inspection as well. *Cf. Hunzinger Constr. Co. v. Granite Res. Corp.*, 538 N.W.2d 804, 809 (Wis. Ct. App. 1995) ("Indeed, the fact that reimbursement for attorneys' fees is not mentioned in the delay-in-delivery clause, even though it *is* provided for specifically in the immediately preceding clause, is cogent evidence that attorneys' fees reimbursement was not intended."). It is undisputed that IBI did not furnish Miller with any details about its relationships with Rajasthan or Him Neel, despite Miller's written request, until discovery in this case. Miller was therefore unable to evaluate and approve in writing the terms of those relationships and thus had an independent basis on which to reject both breweries, a basis provided by IBI. IBI's argument that Miller's failure to inspect its breweries impeded its ability to prevent the agreement from automatically terminating consequently lacks merit.

IBI's alternative argument, that Miller breached the implied duty of good faith by failing to inspect Him Neel and Rajasthan, fares no better. It is true that under Wisconsin law a duty of good faith is implied in every contract, *Wis. Alumni Research Found. v. Xenon Pharms., Inc.*, 591 F.3d 876, 885 n.5 (7th Cir. 2010), and "a party may be liable for breach of the implied contractual covenant of good faith even though all the terms of the written agreement may have been fulfilled," *Foseid v. State Bank of Cross Plains*, 541 N.W.2d 203, 212 (Wis. Ct. App. 1995). But to breach the duty of good faith, Miller would have

had to act arbitrarily and unreasonably in declining to inspect Him Neel and Rajasthan. *See Ekstrom v. State*, 172 N.W.2d 660, 661 (Wis. 1969). Miller did no such thing; it objectively reviewed the specifications for the breweries and informed IBI that they could not meet its standards before declining to visit them. That is the antithesis of arbitrary and capricious behavior. It matters not that some of the absent equipment was used exclusively for high gravity brewing; other absent equipment was used for packaging and assuring the quality of Miller beer brewed by any means. Miller's interactions with its other licensees are equally irrelevant. The terms of this license agreement are at issue here, not the terms of any others Miller may have negotiated.

### III.  Conclusion

The agreement between IBI and Miller is not ambiguous as to Miller's duty to inspect breweries. Summary judgment was appropriately granted in Miller's favor on IBI's breach of contract and good faith claims. We therefore AFFIRM.