In the
# United States Court of Appeals
### For the Seventh Circuit

No. 19-2290

R3 COMPOSITES CORP.,

*Plaintiff-Appellee,*

*v.*

G&S SALES CORP.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:16-cv-00387-HAB-SLC — **Holly A. Brady**, *Judge.*

ARGUED JANUARY 22, 2020 — DECIDED JUNE 1, 2020

Before WOOD, *Chief Judge*, and SYKES and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. The central issue in this case is whether R3 Composites Corporation owes G&S Sales Corporation any additional sales commissions for work G&S did as a representative for R3. The parties agreed on a written contract. The critical term dealing with sales commissions did not show any agreement on commission rates. It said instead that the parties would try to agree on commission rates on a job-

by-job, customer-by-customer basis. Everyone agrees that the original "agreement to agree" would not have been enforceable by itself, but the parties did in fact later agree on commission rates for each customer and went forward with their business.

The district court granted summary judgment for manufacturer R3, relying primarily on the original failure to agree on commission rates. We reverse. A reasonable jury could find that the later job-by-job commission agreements were governed by the broader terms of the original written contract. The rest of the case is rife with factual disputes that cannot be resolved on summary judgment.

I.  *Facts for Summary Judgment and Procedural Background*

   A.  *The Parties and Their Agreement*

R3 molds custom fiberglass parts for a variety of industrial applications. G&S was an independent sales representative for R3. The relationship began in 2010, when R3 owner Roy Carver III met Steven Stefani in the course of R3's acquisition of some hydraulic presses. In early 2011, Carver and Stefani began to discuss the possibility of Stefani working as a sales representative for R3. Stefani then brought in his business contact Mark Glidden. By the end of January 2011, Glidden and Stefani had formed G&S Sales Corp. The company, a Michigan corporation, was owned jointly by Stefani and his wife, Patricia Stefani. Glidden styled himself as G&S's managing partner.

In February 2011, Carver, Stefani, and Glidden had agreed on major parameters of their business relationship. They executed an agreement called a "Non-Disclosure Agreement" ("the NDA") that expressed their mutual understanding.

Much of the NDA governs the confidential technical infor-
mation about R3's business that Glidden and Stefani would
learn as the business relationship evolved. Various provisions
defined what constituted confidential information, specified
how Glidden and Stefani were to handle this information,
listed exceptions to the stated restrictions on disclosure, and
said that Glidden and Stefani would not gain any intellectual
property rights simply by virtue of the information disclosed.

One paragraph is central here. Paragraph 12.2, "Commis-
sion," said in full:

> If G&S obtains jobs for R3, the parties will at-
> tempt to develop an agreement whereby G&S is
> paid a commission with a guideline being a 5%
> commission with the precise commission rate to
> be negotiated on a job-by-job basis. A commis-
> sion will also be paid for any and all extensions,
> renewals, subsequent phases, or additional
> terms of any such job obtained by G&S for R3,
> the amount of which to be determined on a job-
> by-job basis. Any commissions to be paid to
> G&S in this Section 12.2 are predicated upon
> G&S fulfilling all of its obligations under this
> Agreement, including without limitation, those
> provisions of Section 12.3 immediate following.

Paragraph 12.3 provided in part that G&S would not interfere
with "any existing R3 jobs by attempting to transfer such
work to other molders."

Paragraph 13, "Termination," provided: "Either party
may, at any time, terminate this Agreement effective upon

written notice to the other party. Notwithstanding such termination, the obligations of each party as set forth in Sections 2, 3, 4, and 12 of this Agreement shall survive termination of this Agreement." (Section 2 defined "confidential information;" section 3 placed restrictions on use of that information; and section 4 established that neither party could hire employees of the other without consent for two years after the last disclosure of confidential information.) No other provisions of the contract governed the commissions R3 would pay G&S.

After the parties signed the NDA, G&S brought a significant sales lead to R3: a company called Aquatic Bath. Over several months, G&S and R3 worked together to win Aquatic Bath's business. Aquatic Bath and R3 signed a contract on July 8, 2011, with an initial term of three years. The Aquatic Bath business seemed like a sure thing as early as May 2011. That's when R3's Carver offered G&S's Glidden the position of Plant Manager at R3's plant so that he could work on production for the Aquatic Bath contract. Glidden accepted the position and began work at R3 on June 1, 2011. In a choice that seems to lie at the heart of this lawsuit, Glidden maintained his role at G&S while also working for R3. Stefani and Glidden discussed the potential for conflicts of interest, but they ultimately agreed that Glidden could continue in both roles.

The Aquatic Bath business did not prove as lucrative as R3 and G&S had hoped. In a series of emails between February and July 2012, R3's Carver and G&S's Stefani debated the appropriate commission rate and the prospects for the Aquatic Bath account. They ultimately agreed to a 3 percent commission once monthly sales reached $600,000, which G&S says

happened around March 2013. During this time, G&S contin-ued to provide leads to R3, resulting in business from several other customers: Janesville Acoustic, Trivector, Max Secure, and American Stonecast. The parties agree on this much. Their accounts diverge beginning with events in 2014.

B.  *The Dispute Over Commissions and the Termination*

In 2014, Aquatic Bath, the most lucrative account, changed its purchase order procedures. Rather than using a blanket purchase order, as it had previously, Aquatic Bath began to issue individual purchase orders. It also changed the way raw materials were supplied, though the parties dispute exactly how. R3 says its agreement with Aquatic Bath did not require Aquatic Bath to buy materials and parts from R3. Aquatic Bath decided to begin providing its own sheet molding com-pound and began paying R3 only for its molding work. Carver spoke with Glidden about paying G&S its commission rate on only the reduced amounts Aquatic Bath paid R3 for only the molding work—not on the full price of the products, which would have included the costs of materials. R3 recog-nized that the change reduced G&S's total commissions, but R3 says the reductions were entirely above-board because Glidden had agreed to the change on behalf of G&S.

G&S sees things differently, and because we are reviewing a grant of summary judgment for R3, we must give G&S the benefit of conflicting evidence and reasonable inferences from the evidence. First, G&S characterizes the 2014 R3–Aquatic Bath purchase agreement in quite different financial terms. In G&S's telling, R3 was to buy the sheet molding compound from Aquatic Bath (instead of receiving it for free), complete its molding work, then sell the products back to Aquatic Bath at full price, rather than charging only for the molding work.

G&S contends it was entitled to commissions representing 3 percent of the full price of the finished products, not just the price of the molding work alone. The change in buying practices was cutting its commissions by nearly 50 percent, amounting to hundreds of thousands of dollars. Glidden, perhaps wearing two hats at once, told G&S of the new arrangement. According to G&S, though, those emails misrepresented the nature of the R3–Aquatic Bath relationship, resulting in underreporting and underpayment of commissions.

G&S and R3 also disagree about the calculation of commissions on two other accounts, for Janesville Acoustics and Trivector. According to G&S, as these accounts' profitability fluctuated, Glidden, in his capacity as R3's Plant Manager, began by deciding how much commission he wanted to pay G&S each month, then instructed R3's CFO to doctor the underlying sales figures to produce the desired result. R3 does not substantially dispute this but says that its CFO believed that Glidden had the authority, in his capacity as G&S's managing partner (a title that Stefani disputes), to change commission rates. For purposes of R3's summary judgment motion, we must assume that Glidden did not have authority from G&S to agree to these changes and did not disclose these changes to Stefani.

On June 24, 2015, R3 invoked the termination clause of the NDA. G&S stopped looking for new business for R3. Under the terms of Paragraphs 13 and 12.2 of the NDA, R3 continued to pay commissions to G&S on existing jobs, though the parties dispute whether R3 paid the appropriate amounts. G&S reminded R3 in a July 10, 2015 letter that its commission payment obligations survived the termination of the agreement, per the terms of Paragraph 13 of the NDA. During the year

following termination, R3 and G&S attempted to negotiate a new agreement but were not able to do so. Negotiations broke down for good in September 2016. According to G&S, R3's payment of August 2016 was insufficient and did not reflect the full amount of commissions then due for May and June 2016. R3 stopped making payments altogether in September 2016.

C. *This Lawsuit*

This lawsuit began when R3 filed a complaint in an Indiana state court on October 21, 2016. The complaint sought a declaratory judgment on two points: first, that the NDA was enforceable and that R3 had already paid all commissions due G&S under that agreement, and second, that R3 had paid all commissions due and would not be liable for any additional payments even if the court found the NDA was unenforceable. G&S removed the case to federal court based on diversity of citizenship. G&S also filed counterclaims for breach of contract, exemplary damages, and fees under the Indiana Sales Commission Act, and a declaration that R3 was liable for continuing commissions under the NDA. (In the meantime, Aquatic Bath had continued to do business with R3.)

After time for discovery, R3 moved for summary judgment on thirteen distinct issues. The first eight dealt with various aspects of interpretation of the NDA and R3's commission obligations under that agreement. Two covered Glidden's actual or apparent authority to agree to or to initiate modifications of commission rates or sales numbers reported to G&S. Two pertained to G&S's Indiana Sales Commission Act claims. And in the last, R3 argued, in the alternative, that the NDA was illusory and that as a result, G&S would be entitled to commissions on only a portion of the Aquatic Bath

business, not the continuing orders placed after R3 terminated the NDA in June 2015.

Chief Judge Springmann granted summary judgment as to the last issue but denied it as to the first twelve. See *R3 Composites Corp. v. G&S Sales Corp.*, 2019 WL 979565, No. 1:16-cv-00387-TLS (N.D. Ind. Feb. 27, 2019). The court reasoned that it "would be unable to fashion a remedy" as to prospective commissions due under the NDA because the agreement did "not detail the commission rate R3 would be obligated to pay." The court also found, however, that the parties had neither demonstrated the existence nor the particulars of any potential implied or oral contract, and that genuine issues of material fact existed around Glidden's dual-agent roles, so that a trial was needed on all other issues.

Neither side accepted that decision. G&S moved for partial reconsideration, disputing the court's determination that the NDA was illusory. G&S also requested leave to file a second amended counterclaim to plead the existence of, and for recovery under, implied and/or oral commission contracts for specific customers. R3, on the other hand, moved to amend or modify the court's decision, seeking for the first time summary judgment across the board. Its new theory was that G&S had not expressly pleaded the existence of implied and/or oral commission contracts, which R3 argued was the only basis for any claim by G&S after the NDA was deemed illusory.

While those motions were pending, the case was reassigned to Judge Brady, who granted R3's motions, denied those of G&S, and entered final judgment for R3 on all claims. See *R3 Composites Corp. v. G&S Sales Corp.*, No. 1:16-cv-00387-HAB (N.D. Ind. June 5, 2019). Judge Brady found that Para-

graph 12.2 of the NDA, governing commissions, was unenforceable and that any subsequent agreements, should they exist, were separate contracts: "What G&S is really asking the Court to do is consider subsequent agreements, and to find that these agreements further define the NDA's wording regarding R3's obligation to pay commission to G&S." Judge Brady rejected that theory, finding that the NDA's gap could not be filled in by the later job-by-job agreements that it anticipated. She also found that G&S waited too late to seek leave to amend its counterclaim to add what the judge viewed as a new and distinct implied contract claim: G&S had been "aware of the wording of the NDA from the beginning of the litigation" and therefore could not argue that it had only become aware of the need to amend its pleading when R3 moved for summary judgment. G&S has appealed.

II. *Summary Judgment and the "Job-by-Job" Agreements*

We review a grant of summary judgment de novo, *India Breweries, Inc. v. Miller Brewing Co.*, 612 F.3d 651, 658 (7th Cir. 2010), and in this case we apply the substantive law of Indiana to the questions of contract formation and interpretation. *Id.*, citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938), and *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007). We view all facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009). "That is, summary judgment is warranted if there are no genuine issues of material fact with respect to the interpretation of the … agreement; ambiguity with respect to a material matter precludes summary judgment." *India Breweries, Inc.*, 612 F.3d at 658, citing *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006).

We begin by identifying which issues were actually at
stake at the summary judgment phase. The parties, both dis-
trict judges, and this court all agree that Paragraph 12.2 of the
NDA, quoted above, was illusory and unenforceable *on its
own*. The phrase "the parties will attempt to develop an agree-
ment" on commissions is an unmistakable agreement to
agree, not a binding contractual commitment. But Paragraph
12.2 does not stand on its own. The evidence shows that after
agreeing to the NDA, the parties in fact succeeded in agreeing
on job-by-job commission rates. They proceeded to honor
those agreements, at least for a time, including R3's payments
of commissions to G&S after R3 terminated the NDA.

One view of the evidence, needed to sustain summary
judgment for R3, is that each of those job-by-job agreements
stood by itself, independent of the original NDA. Another
view of the evidence, argued by G&S, is that the job-by-job
commission agreements were exactly what Paragraph 12.2 of
the NDA contemplated. Under that view, the NDA acted as
an umbrella agreement that supplied generally applicable
terms of the parties' agreement (including post-termination
commissions), which were adapted to particular customers
by the job-by-job agreements. Accordingly, under the latter
view of the case, many factual disputes are material and re-
quire a trial.

In granting summary judgment for R3, Judge Brady did
not engage with G&S's theory on the merits. She accepted
R3's argument that G&S had abandoned any theory based on
the job-by-job agreements. We respectfully disagree. The
grant of summary judgment to R3 was based on an abuse of
discretion in not allowing G&S to rely on the later job-by-job
commission agreements under the umbrella of Paragraph

12.2 of the NDA. That is a perfectly viable theory under contract law, and G&S did not need to amend its complaint to pursue that theory. "Plaintiffs need only plead facts, not legal theories, in their complaints." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014). We agree in essence with Chief Judge Springmann's original decision (a) that Paragraph 12.2 of the NDA was of course not enforceable standing alone to establish any commission rates, but (b) that the rest of the case is rife with genuine issues of material fact.

Paragraph 12.2 of the NDA was unenforceable in and of itself as an agreement to agree. See, e.g., *Wolvos v. Meyer*, 668 N.E.2d 671, 675 (Ind. 1996) (contracts must demonstrate "intent to be bound and definiteness of terms," quoting 1 Arthur Linton Corbin & Joseph M. Perillo, Corbin on Contracts § 2.8 at 131 (rev. ed. 1993) ("Promises may be indefinite …. The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound.")). But Indiana law also recognizes that different writings—or writings and conversations, or writings and conduct, for that matter—may be combined to create a contract that is sufficiently definite to enforce. See, e.g., *Citizens Progress Co., Inc. v. James O. Held & Co., Inc.*, 438 N.E.2d 1016, 1021 (Ind. App. 1982) ("Indiana recognizes the validity of a contract resting partly in writing and partly in parol"); *Gerdon Auto Sales, Inc. v. John Jones Chrysler Dodge Jeep Ram*, 98 N.E.3d 73, 79–80 (Ind. App. 2018) (holding that a contract could be enforced as modified by the parties' conduct); see also *Druco Restaurants, Inc. v. Steak N Shake Enterprises, Inc.*, 765 F.3d 776, 783–84 (7th Cir. 2014) (applying *Wolvos*, holding that an option contract combined with a later deal struck by the parties could be sufficiently definite to be enforced, and observing that "[t]he difference between an unenforceable 'agreement to agree' and a valid option contract

depends upon intent to be bound and definiteness of terms"); *Mays v. Trump Indiana, Inc.*, 255 F.3d 351, 358–59 (7th Cir. 2001) (reviewing multiple letters and evidence of oral conversations collectively to determine whether a contract was sufficiently definite to be enforced under Indiana law). Paragraph 12.2 of the NDA was not enforceable by itself, but it could, as that paragraph expressly contemplated, combine with subsequent writings and/or conversations and/or conduct to become enforceable.

This possibility was evident, as we read the record, from the outset of the lawsuit. From the beginning of the suit, *both parties* alleged the existence of the later job-by-job agreements on commissions on particular accounts. Both parties even framed these agreements as contemplated by, and pursuant to, Paragraph 12.2 of the NDA. Tracing the contested aspects of the pleadings and discovery shows why the agreement to agree about commission terms in Paragraph 12.2 of the NDA does not resolve the case.

In our system of notice pleading, complaints need only plead facts sufficient to put defendants on notice of the claims against them. "[T]he federal courts require notice pleading, not fact pleading complete with all the minutiae. A complaint need only provide notice of a plausible claim; there is no rule requiring parties to plead legal theories or elements of a case." *Auto Driveaway Franchise Systems, LLC v. Auto Driveaway Richmond, LLC*, 928 F.3d 670, 675 (7th Cir. 2019), citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); see also Fed. R. Civ. P. 8(a)(2) (a viable pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief").

In its brief on appeal, R3 argues that G&S always relied exclusively on the language in Paragraph 12.2 of the NDA and thereby limited the theories available on summary judgment. We read the record differently. G&S's filings consistently treated any later agreements as to commission rates as falling under the NDA. Paragraph 7 of its initial counterclaim, filed November 14, 2016, alleged that "G&S fully performed and complied with the provisions of § 12 of the Agreement and was responsible for obtaining jobs sourced to R3 which have been generating annual sales to R3 in excess of $10 million per year," explicitly connecting Paragraph 12 with subsequent business generated and the amounts due to G&S as a result. And Paragraph 10 of the counterclaim alleged:

> R3 generally continued to pay the sales commissions to G&S *which were required under the Agreement* from June of 2015 through August of 2016. During this time period, the parties discussed the possibility of adjusting the sales commission rates for the commissionable jobs. The parties were unsuccessful in negotiating new commission rates, however, and R3 then unilaterally stopped the payment of the required commissions in violation of the Agreement. (Emphasis added.)

This paragraph, in particular, portrayed the job-by-job commission agreements as falling under the umbrella of the NDA, not as stand-alone contracts. This paragraph was enough to put R3 on notice that the later job-by-job agreements were part of the case using what we might call the umbrella theory.

R3 and Judge Brady read G&S's later interrogatory re-
sponses as disavowing any reliance on the later job-by-job
agreements as part of the NDA. We disagree with this reading
of the responses. R3 relies most heavily on G&S's response to
Interrogatory No. 7, which asked for the pertinent details of
any agreement between G&S and R3 other than the NDA.
G&S responded: "Defendant is not aware of any other agree-
ments at this time."

We understand how that answer, in isolation, might be
read as R3 argues. In responses to Interrogatory Nos. 8, 9, and
10, however, G&S's theory was quite clear. Number 8 asked
for the particulars of any modifications to any agreements be-
tween the parties. G&S answered that the NDA was modified
orally as to the commission rate on the Aquatic Bath account.
Number 9 asked for any allegations of R3's failure to comply
with, and/or breach of, any terms of any agreement with G&S.
G&S responded that "R3 breached § 12.2 and § 13 of the Non-
Disclosure Agreement by failing to pay G&S sales commis-
sions with those sections, including post-termination sales
commissions." Number 10 asked for details about any conten-
tions that R3 failed to pay G&S for services rendered. G&S
answered in relevant part:

> Pursuant to § 12.2, once the job was obtained, R3
> was required to pay sales commissions to De-
> fendant on the job at the agreed-upon rate. The
> agreed-upon rate was 3% for the Aquatic [Bath]
> account, and 5% for all jobs with all other ac-
> counts. R3 was also required to pay commis-
> sions on any and all extensions, renewals, sub-
> sequent phases and additional terms of such
> jobs.

Taken together, the original allegations and the responses to interrogatories make clear that G&S at all times considered the particular commission rates negotiated for each account to fall within the broader ambit of Paragraph 12.2 of the NDA, even though the four corners of that document had not (yet) specified any commission rates. In other words, G&S asserted, and did not disavow, its legally viable theory for treating the job-by-job commission agreements as covered by the NDA umbrella.

If that were not enough, and it is, R3's own allegations reflected that approach to the NDA and the job-by-job agreements. In R3's original complaint, Paragraph 15 alleged that "R3 paid G&S commissions for each production contract and/or purchase order, negotiated on a job-by-job basis, with the commission amount varying based on each job's profitability." Paragraph 22 alleged that "R3 paid G&S commissions for each production contract and/or purchase order sourced by G&S, negotiated on a per job basis, with the commission amount varying based on each job's profitability." Paragraph 31 alleged that "R3 attempted in good faith to negotiate a reasonable commission on a job-by-job basis *as required by the Agreement*." (Emphasis added.) And paragraph 49 alleged that "G&S is not entitled to any further commissions pursuant to the Agreement and/or any implied agreement."

These allegations were echoed in R3's prayer for relief: "WHEREFORE, plaintiff, R3 Composites Corp., by counsel, requests that, if the Court finds that the Agreement [NDA] is unenforceable and that an implied contract exists, that the Court enter an order finding that R3 has paid defendant, G&S Sales Corp., all commissions to which G&S was entitled under the implied contract; that R3 is not obligated to pay G&S any

future commissions under the implied contract; and for all other just and proper relief." Thus, R3's own pleadings signaled that it thought the job-by-job commission agreements were part of the case from the beginning, and G&S certainly never rejected that theory.

In short, the dispute to be resolved in this case comes down to what was framed by R3 in its initial complaint for declaratory judgment: R3 and G&S signed an NDA contemplating subsequent negotiation of commission rates on particular accounts, with continuing obligations to pay surviving the termination of the agreement. G&S went out and found some business for R3. The two parties in fact negotiated commission rates on that business, and R3 paid G&S some money. G&S thinks R3 owes it more money. R3 thinks it has paid G&S everything it was due. Who is right depends on disputed facts about which customers of R3 paid it how much and on what terms, how much R3 paid in commissions to G&S, and whether G&S agreed to the amounts it actually received.

"[A] contract establishes a relationship among the contracting parties that goes well beyond their express promises. The promise, or group of promises, or other bargain, is fleshed out by a social matrix that includes custom, trade usage, prior dealings of the parties, recognition of their social and economic roles, notions of decent behavior, basic assumptions shared, but unspoken by the parties, and other factors, most especially including rules of law, in the context in which they find themselves." 1 Corbin on Contracts § 1.3, Definition of the Term "Contract" (2019) (providing a "richer, more helpful" definition of the term). "Courts construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served." 11 Williston on

Contracts § 31.2 (4th ed. 2019), citing *Hooks v. Samson Lone Star, Limited Partnership*, 457 S.W.3d 52 (Tex. 2015). In interpreting and enforcing contracts here, the law takes into account the parties' actions and pragmatic consequences of their agreements and actions.

The evidence on summary judgment does not bar G&S's reliance on the job-by-job commission agreements under the NDA umbrella. R3's theory seems to be that each job was its own agreement, bearing no relationship to the NDA. That theory is inconsistent with at least R3's earlier pleadings, and we see little evidence to support it. The NDA's language does not support R3's theory. It expressly contemplates such agreements, and the absence of more general terms in the job-by-job agreements weighs in favor of, and at least permits, treating each as under the general umbrella of the NDA.

We asked the parties whether particular evidence helped choose between the parties' competing theories—R3's theory of job-by-job agreements as entirely independent of one another and the NDA, or G&S's theory that each job-by-job agreement in effect completed the open term of Paragraph 12.2 under the NDA umbrella. We were not directed to evidence favoring R3's theory. By contrast, G&S's evidence includes the important fact that R3 acted as if each job-by-job agreement *was* subject to the NDA. Recall that Paragraph 12.2 provided: "A commission will also be paid for any and all extensions, renewals, subsequent phases or additional terms of any such job obtained by G&S for R3, the amount of which to be determined on a job-by-job basis." R3 continued to pay at least some portion of the commissions due after the parties terminated the agreement. As best we can tell, any obligation to pay could have come only from the NDA itself, as applied

to each job-by-job commission. There was no claim of any other source for that continuing obligation to pay.

The NDA shows that the parties, at minimum, contemplated doing business together and reaching further, more specific agreements as to commission rates. The NDA treated the customer-by-customer rates as the *only* term that remained to be worked out. That price term is critical, of course, and without later explicit or implied job-by-job agreements, there would be no obligation to pay. But it is not difficult to read Paragraph 12.2 of the NDA as stating the parties' agreement on all other terms for those agreements, including R3's obligation to continue paying commissions on later sales, even after termination of the NDA itself.

The existence of later job-by-job commission agreements is not in dispute. Both parties pleaded as much. In fact, lots of business was done and lots of money changed hands. The parties disagree on the percentage G&S was owed on particular accounts, and on the base sales amounts from which the commissions were to be calculated. Much of the dispute hinges not on the particulars of the NDA or the later job-by-job agreements between R3 and G&S, but rather on whether Glidden—the purported managing partner of G&S and simultaneous manager of R3—had the actual or apparent authority to bind either party or both to modifications as to any particular customers. The factual resolution of the R3–Aquatic Bath arrangement after 2014 is also highly relevant to the question of whether G&S is owed any additional commission on that account. Chief Judge Springmann recognized these issues in her initial summary judgment ruling, which addressed the interpretation of the NDA, the issue of implied

and/or oral contracts as to commissions, and Glidden's apparent agency. Though Indiana law considers mere "agreements to agree" unenforceable, it recognizes that such agreements, combined with evidence that the parties later reached a definite agreement through further writings or conversations, can be enforceable. *Sand Creek Country Club, Ltd. v. CSO Architects, Inc.*, 582 N.E.2d 872, 875 (Ind. App. 1991). The job-by-job commission agreements pleaded by both parties could have combined with Paragraph 12.2 of the NDA to become enforceable. See *Wildwood Industries, Inc. v. Genuine Machine Design, Inc.*, 587 F. Supp. 2d 1035, 1046–47 (N.D. Ind. 2008) (applying Indiana law: "valid written contract need not be in a single self-contained document; it may consist of multiple documents so long as the necessary elements for contract formation exist"), citing *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1138 (Ind. App. 2002), and *Johnson v. Sprague*, 614 N.E.2d 585, 590 (Ind. App. 1993). It is for the jury to decide under Indiana law the extent of Glidden's authority and the proper interpretation of any commission agreements that were negotiated pursuant to the NDA. Accordingly, summary judgment in R3's favor across the board was erroneous.

III. *Denial of Leave to Amend*

During the second round of summary judgment briefing, G&S sought leave to amend its counter-complaint to allege "the existence and details of an implied and/or oral contract between the parties, and to include alternative theories of recovery in its Counter-Complaint based on contract implied in law and contract implied in fact." Judge Brady denied this motion on the ground that it was too late and G&S had not shown good cause for its delay, relying on our decision in *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011) (district

court is "entitled to apply the heightened good-cause stand-ard of Rule 16(b)(4) before considering whether the require-ments of Rule 15(a)(2) [are] satisfied"). G&S had been aware of the NDA's wording from the outset of the case, the court reasoned, which should have given it sufficient notice that the NDA might be held unenforceable. For its part, R3 argues that it raised the unenforceability argument in its original com-plaint for declaratory judgment, and that throughout the dis-covery process, G&S explicitly disavowed reliance on any contract other than the NDA.

We review a denial of leave to amend a pleading for abuse of discretion. *Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, 786 F.3d 510, 524 (7th Cir. 2015), citing *Gan-dhi v. Sitara Capital Management, LLC*, 721 F.3d 865, 868 (7th Cir. 2013). Rule 15 provides that district courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). District courts may deny leave to amend, however, where there is a good reason to do so: "futility, undue delay, prejudice, or bad faith." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 417 (7th Cir. 2019). One party may be prejudiced where the other has changed one of its critical legal theories at the eleventh hour in a way that the other side could not have foreseen. *Id.*

"Although *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), require that a complaint in federal court allege facts sufficient to show that the case is plausible … they do not undermine the principle that plaintiffs in federal courts are not required to plead legal theories." *Hatmaker v. Memorial Medical Center*, 619 F.3d 741, 743 (7th Cir. 2010) (citation omitted). So, as a threshold matter, G&S need not even have sought to amend the complaint to

include "alternative theories of recovery … based on contract implied in law and contract implied in fact" in order to pursue those alternative theories of recovery. The complaint, in other words, did not dictate the legal theories G&S was permitted to rely on later in the lawsuit.

As noted above, in their original pleadings, both parties pleaded the existence of implied and/or oral contracts governing commissions to be paid, and G&S's discovery responses did not disavow reliance on those job-by-job commission agreements. Thus, the outcome of G&S's motion to amend should not have been decisive. G&S's delay in filing this unnecessary motion to amend should have no consequence. In denying leave to amend, the district court should not have relied on G&S's supposed lack of diligence. Its request was prompted only because the issues for summary judgment were erroneously narrowed in the first place.

The judgment of the district court in favor of R3 is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

SYKES, *Circuit Judge*, dissenting. My colleagues have conceptualized this contract claim in a way that bears little resemblance to the claim G&S Sales Corporation actually raised and litigated below. It's not our role to situate the case within a viable theory of recovery; that's the job of the plaintiff's lawyer. (Here, G&S is the counterclaim plaintiff.)

In the district court, G&S premised its breach-of-contract claim exclusively on the existence of an enforceable written contract—the Non-Disclosure Agreement ("NDA"). It stuck with that characterization of its claim for more than three years of litigation, through the close of discovery and at the summary-judgment phase. It wasn't until *after* Judge Springmann ruled on summary judgment that the NDA is an unenforceable "agreement to agree" that G&S belatedly sought to amend its complaint to add claims premised on the existence of an enforceable oral contract or, alternatively, an implied-in-fact contract, and to seek recovery under the implied-in-law contract doctrines of quantum meruit and unjust enrichment. Judge Brady reasonably rejected this major pivot as coming far too late in the case.

The majority accepts that the NDA is an unenforceable "agreement to agree" but reverses Judge Brady's order based on a new concept of the claim: that the unenforceable NDA + the parties' job-by-job negotiations + the parties' conduct = the contract. Whatever the viability of this novel theory, it's not how G&S litigated the claim in the district court. True, the parties spent a lot of time developing a record about their course of conduct after the NDA was signed, but the significance of that post-agreement conduct was limited to the dispute about the enforcement of the *written* contract. Notably, G&S did not argue at summary

judgment that *if* the NDA was illusory and unenforceable, then the parties nonetheless had an enforceable *oral* agreement to pay commissions, or that their course of conduct independently demonstrated the existence of an implied contract, or that the evidence was sufficient for a reasonable jury to find liability under the doctrines of quantum meruit or unjust enrichment.

These are separate and distinct forms of contract liability, each with its own legal elements and factual predicates. Under Indiana law "[t]here are three general types of contracts—express, implied-in-fact, and constructive." *Zoeller v. E. Chi. Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009). "Express and implied-in-fact contracts are traditional contracts," but "constructive contracts"—i.e., contracts implied in law under the doctrines of quantum meruit and unjust enrichment—"are not contracts at all." *Id.* 220–21.

An express contract may be either written or oral; Indiana law also recognizes the validity of contracts that are partly written and partly oral *provided* that the parol evidence rule does not apply *and* with the important caveat that a contract partly in writing and partly oral is considered "a mere oral contract." *Citizens Progress Co. v. James O. Held & Co.*, 438 N.E.2d 1016, 1021 (Ind. Ct. App. 1982); *see also Majd Pour v. Basic Am. Med., Inc.*, 555 N.E.2d 155, 158 (Ind. Ct. App. 1990). An implied-in-fact contract, on the other hand, rests entirely on implications arising from the parties' conduct. *DiMizio v. Romo*, 756 N.E.2d 1018, 1024 (Ind. Ct. App. 2001) (explaining that "an express contract is evidenced by spoken or written words while an implied contract is evidenced by the conduct of the parties"). In contrast, a quantum-meruit claim is available when the plaintiff confers

a benefit on the defendant at the latter's express or implied request and with the expectation of payment, if the failure to require payment would be unjust. *Woodruff v. Ind. Family & Soc. Servs. Admin.*, 964 N.E.2d 784, 791 (Ind. 2012). And a claim for unjust enrichment lies when the plaintiff confers "a measurable benefit" on the defendant "under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Zoeller*, 904 N.E.2d at 220.

It should be clear from this brief discussion that these categories of contractual and quasi-contractual recovery are different and not interchangeable. Pleading a single claim for breach of a *written* contract, as G&S did, is not enough to sweep in all forms of possible contract liability that might provide a different basis for recovery if the written contract claim fails. For example, the existence of an enforceable oral agreement cannot be plausibly inferred from a complaint that pleads *only* a breach of a written agreement. Nor do allegations that the defendant breached a written agreement support a claim for breach of an implied-in-fact contract, which rests on inferences from conduct alone, much less a quantum-meruit or unjust-enrichment claim. G&S itself recognized this and hastily moved for leave to file an amended complaint adding these new claims after Judge Springmann ruled that the NDA is illusory and unenforceable.

My colleagues characterize this procedural step as unnecessary, invoking the aphorism that a complaint need not plead legal theories. Majority Op. at 20–21. That principle has no application here. This litigation moved well past the pleading stage, through several years of discovery and full summary-judgment briefing. G&S consistently characterized

its claim as one for breach of a written contract, specifically the NDA. Our litigation system requires a plaintiff to identify all legal grounds on which recovery is sought. Rule 16(b)(3)(A) enforces this obligation through the device of a mandatory scheduling order, a required provision of which is a deadline for amendments to the pleadings. If G&S wanted to raise additional grounds for recovery *beyond* the written NDA—whether based on allegations of an enforceable oral contract; or a contract partly written and partly oral, which Indiana treats as an *entirely* oral contract; or an implied-in-fact contract based on the parties' conduct; or an entitlement to a quasi-contractual form of recovery under quantum meruit or unjust enrichment—then it had to file an amended complaint identifying these additional claims *not later than* the deadline established in the district court's scheduling order. It did not do so.

Judge Brady was therefore right to insist that G&S show good cause for missing the deadline, as Rule 16(b)(4) requires. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011). And she quite reasonably concluded that G&S had not established good cause for its delay.

G&S does not challenge Judge Brady's refusal to revisit Judge Springmann's ruling that the NDA is illusory and unenforceable. That's an appropriate concession. The NDA states only that the parties will "attempt to develop an agreement" on commissions at a later point in the relationship. That's a mere "agreement to agree," and it's well established that "an 'agreement to agree' is not enforceable under Indiana law." *Druco Rests., Inc. v. Steak n Shake Enters., Inc.*, 765 F.3d 776, 783 (7th Cir. 2014); *see also Mays v. Trump Ind., Inc.*, 255 F.3d 351, 357 (7th Cir. 2001) (applying Indiana

law); *Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996) ("The law is well established that a mere agreement to agree at some future time is not enforceable.").

In sum, G&S brought a claim for breach of a written contract, litigated it through summary judgment, and tried to shift its legal basis for recovery only *after* that claim failed. Judge Brady properly rejected this belated effort to add new claims so late in the litigation. We should affirm.